2018 IL App (1st) 143132

No. 1-14-3132

Order filed May 24, 2018

Fourth Division

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 10 CR 18297 |
| | ) | |
| RAMON ROMERO, | ) | Honorable |
| | ) | Thomas V. Gainer Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices McBride and Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Ramon Romero was found guilty of attempted first degree murder, aggravated vehicular hijacking, attempted aggravated vehicular hijacking, and aggravated battery. The circuit court of Cook County then sentenced defendant to concurrent terms of imprisonment of 45, 30, 8, and 3 years, respectively. Prior to trial, the court held two fitness hearings. Following the second fitness hearing, the court found defendant fit to stand trial without medication. Defendant's chief defense at trial was that he was mentally unfit and suffered a psychotic episode at the time of the offense. The court rejected defendant's insanity

defense and found that he had the substantial capacity to appreciate the criminality of his conduct at the time of the offense. 720 ILCS 5/6-2(a) (West 2014).

¶ 2     On appeal, defendant does not contest the sufficiency of the evidence to sustain his conviction but contends that the court erred in rejecting his insanity defense where the defense expert was more qualified than the State expert and considered defendant's entire mental health history. Defendant also contends that the trial court judge improperly assumed the role of the prosecutor in questioning defendant's expert witness and was biased against defendant, denying defendant the right to a fair trial. Defendant further contends that the court erred in preventing his wife from testifying to statements he made prior to his two psychotic episodes. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                              I. BACKGROUND

¶ 4     Defendant was charged with attempted first degree murder, aggravated vehicular hijacking, aggravated battery with a firearm, aggravated discharge of a firearm, attempted aggravated vehicular hijacking, unlawful use of a weapon by a felon, aggravated unlawful use of a weapon, and aggravated battery in connection with an incident that took place on September 11, 2010, in Chicago, Illinois. Prior to trial, the court held two hearings to determine if defendant was fit to stand trial.

¶ 5                  A. Defendant's PreTrial Fitness Hearings

¶ 6                        1. *The Initial Fitness Hearing*

¶ 7     At defendant's first fitness hearing on June 21, 2013, Susan Buratto testified that she was a fellow in forensic psychiatry at Northwestern Memorial Hospital, and the court found that she was qualified as an expert in that field. Buratto testified she and Dr. Stephen Dinwiddie, the training director for forensic psychiatry at Northwestern Memorial Hospital, interviewed

defendant in November 2012. The trial court noted that this report was "stale" but permitted Buratto to testify regarding the interview.

¶ 8    Buratto testified that she and Dr. Dinwiddie diagnosed defendant with bipolar disorder based on his medical records and the information defendant provided about his symptoms. Buratto noted that defendant was on medication at the time of the interview and that it would be in his best interest to continue taking the medication. Buratto testified that she believed that defendant would be able to understand the nature of the proceedings without medication but, due to the waxing and waning nature of bipolar disorder, he would be less able to make good decisions and may not be able to assist his counsel with his defense unless he were on medication. Accordingly, she testified that defendant would be fit to stand trial with medication.

¶ 9    The parties also stipulated to a report from Dr. Nishad Nadkarni who was employed by forensic clinical services at the circuit court of Cook County. The court noted that Dr. Nadkarni evaluated defendant on May 29, 2013, so his report was not stale. Dr. Nadkarni noted that defendant was currently prescribed Depakote, a mood stabilizer; Risperdal, an antipsychotic mood stabilizer; and Klonopin, an antianxiety medication. Dr. Nadkarni concluded, however, that defendant did not require psychotropic medication in order to maintain his fitness and function and found him fit to stand trial without medication. The trial court found that defendant was fit to stand trial with medication.

¶ 10    On April 7, 2014, defense counsel informed the court that defendant had been hospitalized for three weeks and had been taken off his antipsychotic medication. Defense counsel indicated that she was concerned about defendant's ability to assist her during the trial and noted that defendant was having difficulty remaining quiet. The court granted defense counsel's requests for a second fitness hearing.

¶ 11                              2. *The Second Fitness Hearing*

¶ 12     At the second fitness hearing on May 21, 2014, Dr. Nadkarni testified that he was employed by forensic clinical services at the circuit court and the court found that he was qualified as an expert in the field of forensic psychiatry. Dr. Nadkarni testified that in evaluating defendant for his fitness to stand trial, he met with him on May 29, 2013, and May 12, 2014. Dr. Nadkarni also reviewed the records of two other employees from forensic clinical services who had interviewed defendant, Dr. Susan Messina and Dr. Dawna Gutzman. Dr. Messina met with defendant on December 10, 2010, but offered no opinion regarding his fitness because he was uncooperative during his interview. Dr. Messina also met with defendant on April 12, 2011, and January 31, 2012, and on both occasions found defendant to be legally fit and sane. Dr. Gutzman met with defendant on April 25, 2011, and noted that defendant was uncooperative and met with him again on June 27, 2011, and found defendant to be legally fit and sane.

¶ 13     Dr. Nadkarni also reviewed nearly 650 pages of defendant's medical records that he received shortly before the hearing. Dr. Nadkarni noted that these records covered 2010, 2011, and 2012 through 2014 and that some of them were duplicates of records he had already reviewed prior to testifying. Dr. Nadkarni also reviewed notes from Dr. Melvin Hess from 2009 and reviewed a report that was sent to defense counsel from Dr. Dinwiddie on February 21, 2013.

¶ 14     Dr. Nadkarni testified that he conducted a mental status examination of defendant on May 12, 2014. Dr. Nadkarni diagnosed defendant with antisocial personality disorder with narcissistic features and also diagnosed him with cannabis-, cocaine-, and alcohol-use disorder. Dr. Nadkarni testified that his review of defendant's medical records did not change his diagnosis and that defendant did not show a *bona fide* major mental illness. Dr. Nadkarni

determined that defendant was fit to stand trial, that he would understand the trial proceedings, and that he did not require medication to maintain his fitness. On cross-examination, Dr. Nadkarni stated that defendant's medical records showed that defendant's behavior was consistent whether or not he was taking medication and his behavior was not indicative of a *bona fide* major mental illness. The court found that defendant was fit to stand trial without medication.

¶ 15                                      B. Trial[1]

¶ 16                                   1. *State Witnesses*

¶ 17     At trial, Abraham Cardenis testified that he was the Spanish pastor for the Faith Baptist Church in Kankakee, Illinois, and knew defendant because he had attended church on a couple occasions. Cardenis testified that defendant called him on September 11, 2010, and told him that he needed help and needed him to pick him up at Midway Airport. Cardenis drove his blue Mazda Tribute with his brother-in-law to Chicago to pick up defendant. Before getting into the vehicle, defendant smashed his phone on the ground. Cardenis drove around for about an hour looking for the entrance to the Dan Ryan Expressway, but after they were on the expressway, defendant changed his mind about where he wanted to go. Cardenis told defendant that he was not a taxi driver and he would drive him to Kankakee. Cardenis pulled the vehicle over to the side of the road, and defendant pulled out a gun. Defendant forced Cardenis and his brother-in-law out of the vehicle and drove away in Cardenis's vehicle. Cardenis called the police.

---

[1]Prior to trial, defendant repeatedly expressed concerns about being able to wear a suit to the trial. After the circuit court was unsuccessful in obtaining a suit for defendant to wear, defendant refused to attend the proceedings without a suit. The court found that defendant had voluntarily waived his right to be present at the proceedings and arranged for him to listen to the proceedings from lock-up.

¶ 18    Fallon Jackson testified that on September 11, 2010, she lived at 75th Street and South Shore Drive in Chicago. Around 6 p.m. that night, she was sitting in her living room when she heard her "play brother" Tyler arguing with someone in the parking garage. She went down to the parking garage and saw Tyler speaking with defendant, who told her that he needed gas for his vehicle. Jackson saw defendant standing near a blue vehicle that was damaged and leaking fluid. Jackson went back inside her apartment and called police. When she came back outside, she saw defendant walking around the outside of the building.

¶ 19    Chicago police officer Aaron Davis testified that he was on patrol with his partner, Tiawansa Davis, on September 11, 2010, when they received a call about a disturbance in the area of 75th Street and South Shore Drive. When they arrived on the scene, the officers saw Jackson and defendant, who was wearing a white hooded sweatshirt with a green design on it. Jackson testified that she tried to speak with the officers but defendant kept interrupting them. Defendant pulled an orange bible out of his pocket and told Officer Tiawansa Davis to read it. Defendant approached Officer Aaron Davis, who told defendant to not "walk up" on him. Officer Aaron Davis told defendant to leave the area, but he refused to do so. Officer Aaron Davis told defendant that, if he did not leave the area, he would be arrested.

¶ 20    Defendant then pulled out a gun and shot at Officer Aaron Davis's chest. Jackson, Officer Aaron Davis, and Officer Tiawansa Davis ran for cover. Each heard defendant fire at least one more shot. Jackson ran into the building for cover, and the two officers took cover near the parking garage. Defendant entered the officers' police vehicle but could not start it because he did not have the keys. Officer Tiawansa Davis fired her gun into the vehicle at defendant and then took cover with Officer Aaron Davis. She noted that Officer Aaron Davis had been shot in the left shoulder. The officers lost track of defendant's whereabouts, but Jackson saw him leave

the police vehicle and approach a red vehicle at the intersection of 75th Street and South Shore Drive.

¶ 21    Milot Cadichon, an off-duty police officer who lived at the corner of 75th Street and South Shore Drive, saw defendant through his apartment window firing at Officer Tiawansa Davis and then fleeing the scene. Officer Cadichon saw defendant stop a red minivan in the street and force the driver out of the vehicle at gunpoint. Defendant then drove the red minivan a short distance and then stopped the vehicle. He got out of the minivan and stopped a vehicle that was travelling in the opposite direction. He forced the driver of that vehicle out of her car at gunpoint and then drove away.

¶ 22    Sergeant Brian Forberg, who was working as a detective on September 11, 2010, testified that he and his partner were assigned to investigate an aggravated battery of a police officer and an aggravated vehicular hijacking that took place near 75th Street and South Shore Drive. Upon arriving at the scene, Sergeant Forberg spoke with Officer Aaron Davis and Officer Tiawansa Davis and learned that defendant had shot at the officers and hijacked two vehicles. Sergeant Forberg spoke with Dwayne Harris, the driver of the red minivan, who informed Sergeant Forberg that he was disabled and his vehicle had been customized to allow him to drive it. Because of these customizations, defendant was unable to operate the vehicle and abandoned it after driving a short distance. After speaking with Jackson, Sergeant Forberg went into the building's underground parking garage and saw a blue Mazda Tribute that had been damaged. Sergeant Forberg learned that this was the vehicle that had been stolen from Cardenis on the Dan Ryan Expressway.

¶ 23    Juan Zavala testified that in the early morning hours of September 12, 2010, he was at a club called El Tunel in Chicago Heights with a group of friends. Around 1 a.m., Zavala was

standing outside the club when he was approached by defendant, who introduced himself as "Elisio." Zavala invited defendant to join his group of friends at the club. Defendant and Zavala were smoking cigarettes outside the club when police officers arrived and told them to go back inside the club. Once inside, the officers told everyone to leave and then arrested defendant. Zavala gave the officers defendant's white hooded sweatshirt, which defendant had taken off inside the club.

¶ 24    Chicago police officer Luis Vega testified that he learned of a Latin Kings party at El Tunel in Chicago Heights on the night of September 11, 2010. He arrived at the club around 2:30 a.m. and told everyone to leave the club so that he could check their identification. While everyone was leaving the club, he spotted defendant and took him into custody.

¶ 25                                  2. *Defense Witnesses*

¶ 26    Defendant's wife, Mandy Romero, testified that after the birth of their son on August 24, 2009, she was in the hospital recovering for five days. During their stay, defendant "freaked out a little" and would pace around the room and look out the hospital windows. When she was discharged from the hospital, defendant would not drive her home. Mandy testified that defendant was very paranoid and thought people were coming after him. Mandy did not believe that anyone was coming after him but knew defendant had been a member of the Latin Kings until he left the gang in 2007.

¶ 27    Because defendant would not let Mandy take their newborn son to their home, they went to Mandy's mother's home. Defendant, however, would not sleep and would pace back and forth around the house. Mandy took defendant to the Condell Medical Center, where he was treated for anxiety, but Mandy thought he needed to see a psychiatrist. She testified that defendant was not acting normally and she thought he had "snapped." After they left Condell Medical Center,

Mandy tried to get defendant an appointment to see a psychiatrist, but she could not, and defendant "got worse."

¶ 28    A few days later, their infant son urinated on the bed, and defendant became upset because he thought Mandy was trying to kill him with their son's urine. Even though it was the middle of the night, he asked Mandy to wash the sheets immediately. Mandy put the sheets in the washing machine with some of defendant's work shirts, but defendant opened the washing machine while it was running, removed the clothes from the washer, and then ran outside and started looking in the bushes. Defendant began rambling, which scared Mandy, so she called police. The police officers who arrived were able to calm defendant down and told him to leave the house for the night.

¶ 29    Mandy found defendant the following morning at the train station. She drove him to the 'El' station and told him to go to his mother's house in Kankakee. The following week, Mandy learned that defendant was in jail in Kankakee. She and defendant's mother signed a petition to have him involuntarily committed to a mental hospital. Defendant was sent to Riverside Hospital for evaluation. He was there for two days before being transferred to Tinley Park Mental Health Center for further assessment. Defendant was admitted to Tinley Park Mental Health Center for seven days and was prescribed Clonidine and Risperidone.

¶ 30    After his discharge, defendant had follow-up visits at the Helen Wheeler Medical Center in Kankakee. Defendant continually changed his medications because he did not like the side effects. Mandy testified that defendant was doing "very well" from October 2009 until April 2010. However, in May 2010, defendant stopped taking his medication and went into a "downward spiral." Defendant started getting anxious again and would often ramble and talk about the same subject all day. In June 2010, defendant once again started to think that people

were coming after him. In July, defendant became more paranoid and would not eat or sleep. Mandy refused to let defendant watch their children because his paranoia was getting worse. She last saw defendant in August 2010.

¶ 31    On cross-examination, Mandy acknowledged that defendant's brother was a member of the Latin Kings and defendant had been a member at least until 2009. She also testified that from September 2009 to September 2010, defendant had been "self medicating" with marijuana and was also using cocaine.

¶ 32    Dr. Dinwiddie was qualified in the field of forensic psychiatry and testified that, in evaluating defendant, he had been asked to consider whether or not defendant suffered from a mental disease such that he was not criminally responsible for his conduct. In his evaluation of defendant, Dr. Dinwiddie concluded that he believed defendant suffered from a mental disease and lacked the substantial capacity to understand the criminality of his conduct at the time of the offense. In making this determination, Dr. Dinwiddie reviewed defendant's medical records from the Helen Wheeler Center, Riverside Hospital, and Tinley Park Mental Health Center. Dr. Dinwiddie also reviewed the police reports regarding the offense, the reports from the doctors at forensic clinical services at the circuit court, and interviewed defendant for 3½ hours on November 6, 2012. Dr. Dinwiddie noted that defendant was very polite, cooperative, and forthcoming and noted that there was no indication defendant was malingering.[2]

¶ 33    Dr. Dinwiddie testified that, in his opinion, defendant suffered from bipolar effective disorder. Dr. Dinwiddie testified that bipolar effective disorder is

---

[2]Dr. Dinwiddie explained that malingering is a conscious and purposeful fabrication of psychiatric symptoms in order to achieve a given end. In defendant's case, he would be malingering to avoid consequences for his criminal actions.

"classified as a major—primarily a disorder of mood and it has two characteristics. One is it's called a relapsing remitting illness, that is it comes and goes so that if you see an individual during a period of remission either because of the natural course of the illness or because they have been adequately treated, they look perfectly, perfectly normal."

Dr. Dinwiddie noted that defendant had been prescribed some antianxiety and antipsychotic medication and noted that the most important treatment for defendant's illness would be to prescribe him medication that would prevent the illness from recurring. Dr. Dinwiddie testified that some of the symptoms of bipolar effective disorder are lack of sleep, talking a lot, and talking very quickly. Dr. Dinwiddie testified that these symptoms can progress into "clear psychosis, a clear delusion," and he believed that defendant was in such a psychotic state at the time of the offense.

¶ 34      Dr. Dinwiddie testified that defendant's symptoms began with a persecutory delusion: that his wife was trying to kill him with their infant son's urine. After that, defendant was institutionalized and given medication, which improved his condition. Dr. Dinwiddie testified that the fact that defendant's condition improved when he was given antipsychotic medication was a "key finding." Dr. Dinwiddie noted that, when defendant stopped taking his medication, his symptoms returned in the summer of 2010 and, by August 2010, his symptoms had returned to where they had been one year prior when he was institutionalized. Dr. Dinwiddie testified that this history of waxing and waning symptoms narrowed down the type of mental illness that defendant could be suffering from.

¶ 35      With regard to whether defendant was malingering, Dr. Dinwiddie explained that it was important to look at defendant's entire mental health history. He noted that defendant's history showed signs that he clearly has a mental illness, given his long history of symptoms. Dr.

Dinwiddie also observed that leading up to each of defendant's manic episodes, there was a period of build up where defendant's actions became more random and less goal-driven and defendant became more and more paranoid.

¶ 36     Dr. Dinwiddie stressed that it was important to look at defendant's entire history, rather than focusing on specific behaviors, such as his forcing Cardenis and his brother-in-law out of the vehicle at gunpoint. Dr. Dinwiddie testified that actions can have more than one explanation and that, although defendant may have been acting normally at one point, it does not mean that he was not suffering from a manic episode. Dr. Dinwiddie testified that a manic episode can be characterized by an overall increase in reactivity and impulsivity and also sleep disturbance, increased talkativeness, periods of abnormally and persistently elevated or irritable mood, racing thoughts, "hyper religiosity," and an increase in activity. Dr. Dinwiddie believed that defendant exhibited all of these symptoms at the time of the offense.

¶ 37     On cross-examination, Dr. Dinwiddie acknowledged that it is possible that a person can suffer from a mental illness and still have the capacity to appreciate the criminality of his conduct. Dr. Dinwiddie also addressed a report from September 12, 2011, from Dr. Pierre Nunez, who found that defendant was malingering. Dr. Dinwiddie testified that this report was just a "snapshot" of how defendant was doing around that time but did not help relate to the long-term course of defendant's illness. Dr. Dinwiddie also opined that it was "[h]ighly unlikely" that defendant's drug and alcohol use would cause him to have a manic episode.

¶ 38     Dr. Dinwiddie also testified regarding his interview with defendant in November 2012. Dr. Dinwiddie testified that defendant told him that after he stole Cardenis's vehicle, he did not want to drive to his aunt's house because he was afraid police officers would be there to arrest him. Dr. Dinwiddie interpreted this belief as delusional. Defendant also told Dr. Dinwiddie that

he got into an accident while driving Cardenis's vehicle, so he parked the vehicle in a parking garage and removed the deployed airbag so that it would be less easily noticed. Defendant told Dr. Dinwiddie that, after the shooting, he drove to Ann Arbor, Michigan, to go to a casino to have some fun because he knew he would be "apprehended or gunned down."

¶ 39    On redirect examination, Dr. Dinwiddie testified that defendant's psychotic episode began in August 2010, was present at the time of the offense, and was still manifesting after he was taken into custody. Dr. Dinwiddie testified that, although some of defendant's actions appeared rational, that did not change his diagnosis. Dr. Dinwiddie explained that, in evaluating defendant's actions, he had to determine whether these specific acts were in response to his mental illness and explained that defendant would not be unable to act rationally merely because he was in a psychotic state. Dr. Dinwiddie testified that all of defendant's activities as outlined in the police reports and witness testimony were consistent with the distractibility and over-activity of a manic state. Dr. Dinwiddie also testified that Dr. Nadkarni's diagnosis that defendant had a personality disorder was not inconsistent with his diagnosis of bipolar effective disorder and the psychotic episodes.

¶ 40    In regards to defendant fleeing the scene of the incident after shooting Officer Aaron Davis, Dr. Dinwiddie explained that

> "[t]he act of fleeing a scene, how do you know, just based on that, looking at that little piece, how do you know that I'm fleeing because I'm fully aware of what a horrible thing I am doing and I'm trying to avoid punishment, or because I believe falsely, but delusionally and very deeply, I don't know, that the devil is after me or the Martians are going to eat my brains or something."

Dr. Dinwiddie testified that the act of fleeing is thus consistent with a rational appreciation of the situation but also consistent with a delusional belief, and given defendant's "rich history" of persecutory delusions, Dr. Dinwiddie concluded that the most likely explanation for his behavior was that it was impelled by his mental illness and the delusions his mental illness caused.

¶ 41                                   3. *State's Rebuttal*

¶ 42    In rebuttal, Dr. Nadkarni testified that that he met with defendant to evaluate his fitness for trial on April 24, 2013, and May 12, 2014, and on both occasions found him fit to stand trial. Dr. Nadkarni testified that in his opinion, defendant did not suffer from a mental disease or defect. He noted that defendant has a history of substance abuse and personality or character pathology but does not have a history of a major mental illness. Dr. Nadkarni explained that character pathology is a personality disorder and that in his opinion defendant suffers from antisocial personality disorder with narcissistic features. This disorder caused defendant to violate the rights of others to feel "grandiose in himself" and also to lack empathy or reciprocate emotional feelings with others.

¶ 43    Dr. Nadkarni testified that in evaluating defendant, he reviewed Dr. Hess's report from 2009, the Tinley Park Mental Health Center medical records from 2009, the Cermak Health Services medical records, the medical records from Wheeler Medical Center and Condell Medical Center, and the reports from Dr. Messina and Dr. Gutzman. He noted that at no point in defendant's medical history had anyone diagnosed him with a major mental illness. He also noted that Dr. Nunez, who evaluated defendant in September 2011, and Dr. Gutzman, who met with defendant in April and June 2011, both found that defendant was malingering. Dr. Nadkarni had reviewed Dr. Dinwiddie and Dr. Burrato's letter to defense counsel and disagreed with their diagnoses of bipolar effective disorder, manic episodes with psychotic features.

¶ 44   Dr. Nadkarni testified that in evaluating defendant, he learned that he had a leadership role with the Latin Kings until 2008. After he was stripped of that role, defendant told Dr. Nadkarni that he feared members of the Latin Kings were out to get him. Dr. Nadkarni testified that this was not a delusional paranoia for defendant to be afraid that the Latin Kings were coming after him but it was instead a reality-based fear.

¶ 45   Dr. Nadkarni also noted that there was no noticeable effect on defendant's "reality orientation" whether he was on medication or not. This opinion was based on Dr. Nadkarni's meetings with defendant, as well as a review of his medical records. Dr. Nadkarni noted that defendant's conduct remained the same while he was at the Cook County jail whether he was given medication or not. Dr. Nadkarni observed defendant was combative and oppositional toward security personnel but that there were no reports of delusions or hallucinations or signs of mania. Dr. Nadkarni testified that these behaviors were consistent with antisocial and narcissistic personality disorder and not of a major mental illness.

¶ 46   Dr. Nadkarni opined that defendant's actions on the date of the incident indicated that he appreciated the criminality of his actions. Dr. Nadkarni noted that defendant fled after stealing Cardenis's vehicle, which was "goal-directed, logical and organized." Dr. Nadkarni also testified that the fact that defendant hid Cardenis's vehicle in the parking garage was "highly organized" and showed appreciation of his actions being criminal. Dr. Nadkarni noted that, after the shooting, defendant attempted to flee the area, indicating his understanding or appreciation of the illegal nature of his actions. He also noted that upon arriving at the El Tunel club, he asked Zaval if the club was checking identification, which showed goal direction and logic in attempting to hide his identity.

¶ 47    On cross-examination, Dr. Nadkarni acknowledged that he did not know the exact dates defendant was on or off his medication or the exact dates the combinative incidents at the Cook County jail occurred, but he nonetheless maintained that the incidents occurred while defendant was on medication and while he was not on medication. Dr. Nadkarni also acknowledged that he did not review any records of defendant's involuntary commitment at Riverside Hospital on September 29 and 30, 2009.

¶ 48                            4. *Defense Surrebuttal*

¶ 49    In surrebuttal, Dr. Dinwiddie testified that he agreed with Dr. Nadkarni's diagnosis of antisocial personality disorder but also opined that defendant suffered from bipolar effective disorder. Dr. Dinwiddie testified that, as a result of defendant's mental illness, he had suffered two psychotic episodes: one a year before the incident after his son was born and the second during the offense. Dr. Dinwiddie noted that it was important to look at defendant's entire medical history to make a proper diagnosis, including defendant's medication patterns and reports from other doctors and mental institutions.

¶ 50    Dr. Dinwiddie also explained the difference between a bizarre and a nonbizarre delusion. A bizarre delusion is one where there is no further "homework" necessary to verify the veracity of the delusion. Dr. Dinwiddie gave the example of being pursued by "brain-eating Martians," which clearly do not exist and there is no further research necessary. Nonbizarre delusions, on the other hand, may or may not be true but require more research to determine their validity. Dr. Dinwiddie explained that the delusion may be plausible but it would be important to look into the reasons behind the delusion to determine if it is true. Dr. Dinwiddie believed that defendant's fear of the Latin Kings was a nonbizarre delusion. On its face, the delusion seems plausible;

however, defendant told Dr. Dinwiddie that he believed his wife and mother-in-law were part of the plot and that it also involved fears of being poisoned.

¶ 51    Dr. Dinwiddie also testified that the Riverside Hospital medical records were "extremely relevant" to an accurate diagnosis of defendant because they gave a description of defendant's behavior and symptoms at the time of his involuntary commitment. Dr. Dinwiddie believed that, if someone made a diagnosis without considering those documents, it could affect the reliability of their diagnosis. Dr. Dinwiddie also testified that the fact that defendant had a prior similar psychotic episode weighed "very heavily" in determining his diagnosis because during this first episode, defendant had no self-serving motivation to spin it in an exculpatory way.

¶ 52                                    5. *Court Ruling*

¶ 53    In announcing its judgment, the court observed that defendant's first contact with any sort of mental health treatment began with his institutionalization at Riverside Hospital and Tinley Park Mental Health Center. The court determined that during that time defendant was becoming increasingly paranoid about retaliation by the Latin Kings for things that happened while he was a gang member, "[n]ot because of some delusional thought that the Martians are chasing him and they're going to eat his brains but the very real fear that he could at some point be set upon by some very evil men who would do him and his family harm." The court noted that this paranoia coincided with the birth of his child, when defendant became responsible for his family.

¶ 54    The court noted that with the exception of the Riverside Hospital medical records, Dr. Dinwiddie and Dr. Nadkarni had reviewed the same material in evaluating defendant. The court observed that there was an argument that Dr. Nadkarni was less qualified than Dr. Dinwiddie, but noted that it found Dr. Nadkarni to be an expert and had listened to both Dr. Nadkarni's and Dr. Dinwiddie's testimony. The court found that although Dr. Dinwiddie was unequivocal with

his opinion that defendant suffered from a mental illness, and therefore lacked the substantial capacity to appreciate the criminality of his conduct, some of his other testimony was equivocal.

¶ 55    The court then summarized the evidence and defendant's background and determined that defendant's actions were caused by his antisocial personality disorder, as Dr. Nadkarni testified. The court found that defendant's actions were goal-directed, based on his attempts to avoid detection and apprehension by police. The court found that defendant's actions were impelled by real fears and real goals, and not psychotic delusions, such as "Martians coming to eat his brains." The court also found that Dr. Dinwiddie's testimony that defendant suffered from a mental disease that caused him to not appreciate the criminality of his conduct was not clear and convincing. Accordingly, the court found that defendant failed to prove by clear and convincing evidence that he was not guilty by reason of insanity. The court therefore found that defendant was guilty of two counts of attempted first degree murder of a police officer, three counts of aggravated vehicular hijacking, one count of attempted aggravated vehicular hijacking, and two counts of aggravated battery.

¶ 56    Defendant filed a motion for a new trial contending, *inter alia*, that the court erred in rejecting his insanity defense and that the court had demonstrated bias against defendant, in part based on the court's examination of Dr. Dinwiddie, which deprived defendant of his right to a fair trial. The court denied the motion, finding that defendant had failed to adequately prove the defense of insanity, and noted that, although it did engage in some examination of Dr. Dinwiddie, it did not believe such examination was improper in a bench trial. At the following sentencing hearing, after considering the evidence presented in aggravation and mitigation, the court sentenced defendant to concurrent terms of imprisonment of 45 years for attempted first degree murder of a police officer, 30 years for aggravated vehicular hijacking, 8 years for

attempted aggravated vehicular hijacking, and 3 years for aggravated battery. Defendant now appeals.

¶ 57                                    II. ANALYSIS

¶ 58    On appeal, defendant contends that the court erred in rejecting his insanity defense where Dr. Dinwiddie testified that defendant suffered a psychotic episode at the time of the offense, which prevented him from appreciating the criminality of his conduct. Defendant also contends that the circuit court deprived him of the right to a fair trial where the trial court judge assumed the role of the prosecutor in questioning Dr. Dinwiddie, demonstrated bias against defendant, and relied on Dr. Dinwiddie's responses to the court's questions questions in rendering its judgment. Finally, defendant contends that the court erred in preventing his wife, Mandy, from testifying to statements he made prior to both his 2010 and 2009 psychotic episodes, where such statements were not offered for the truth of the matter asserted but to show defendant's state of mind, which was a vital part of his insanity defense.

¶ 59                        A. Defendant's Insanity Defense

¶ 60    Defendant first contends that the circuit court erred in rejecting his insanity defense. Under section 6-2 of the Criminal Code of 2012 (Code), a person is not criminally responsible for conduct if, at the time of the conduct, he suffered from mental disease or defect, such that he lacked substantial capacity to appreciate the criminality of that conduct. 720 ILCS 5/6-2(a) (West 2014). Defendant asserts that Mandy and Dr. Dinwiddie detailed his psychological problems and the court improperly rejected Dr. Dinwiddie's testimony that in his opinion defendant suffered from a major mental illness and experienced an acute psychotic episode at the time of the offense. Defendant contends that the court erred in accepting Dr. Nadkarni's testimony over Dr. Dinwiddie's where Dr. Dinwiddie was a more qualified expert. Defendant maintains that Dr.

Dinwiddie gave more thorough testimony than Dr. Nadkarni and reviewed all of defendant's medical history in forming his opinion that defendant was unable to appreciate the criminality of his conduct at the time of the offense. Defendant also contends that the court erred in finding that Dr. Dinwiddie's testimony was equivocal.

¶ 61                                     1. *Standard of Review*

¶ 62    In Illinois, all defendants are presumed to be sane. *People v. McDonald*, 329 Ill. App. 3d 938, 946 (2002) (citing *People v. Williams*, 265 Ill. App. 3d 283, 289 (1994)). Where a defendant raises the defense of insanity, he bears the burden of proving by clear and convincing evidence that he is not guilty by reason of insanity. 720 ILCS 5/6-2(e) (West 2014).

¶ 63    Whether a defendant was sane at the time of an offense is generally a question for the trier of fact. *McDonald*, 329 Ill. App. 3d at 946 (citing *People v. Martin*, 166 Ill. App. 3d 428, 433 (1988)). "The trier of fact may accept the testimony of one expert over that of another as long as the accepted opinion is based on a credible diagnosis." *Id.* (citing *People v. Tylkowski*, 171 Ill. App. 3d 93, 100 (1988)). As the defendant bears the burden of proof, the State does not need to present expert testimony on the issue of sanity but may rely purely on facts in evidence and the inferences that follow from those facts. *People v. Gilmore*, 273 Ill. App. 3d 996, 1000 (1995). The trier of fact may entirely reject expert testimony if it concludes that the defendant was sane based on factors such as lay testimony based on observations made shortly before or after the crime, the existence of a plan for the crime, and methods undertaken by defendant to prevent detection. *People v. West*, 231 Ill. App. 3d 646, 650-51 (1992). "Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane." *People v. McCullum*, 386 Ill. App. 3d 495, 504 (2008) (citing *Gilmore*, 273 Ill. App. 3d at 1000).

¶ 64    On review, we will not reverse the trier of fact's resolution on the issue of an insanity defense unless it is against the manifest weight of the evidence. *People v. Frank-McCarron*, 403 Ill. App. 3d 383, 396 (2010). A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 65          2. *Circuit Court's Ruling Not Against the Manifest Weight of the Evidence*

¶ 66    Here, we find that the evidence presented supported the circuit court's finding that defendant was sane at the time of the offense. The State presented the largely uncontroverted testimony of witnesses, police officers, and victims, as well as the expert testimony of Dr. Nadkarni to illustrate defendant's mental state preceding, during, and after the offense. The court could consider this lay testimony in conjunction with the expert testimony in ruling on defendant's insanity defense. The court's ruling reflects that it considered the fact that defendant appeared to appreciate the criminality of his conduct, by attempting to conceal the vehicle he stole from Cardenis and his flight after the shooting, in finding him guilty and not insane. Although Dr. Dinwiddie testified that these actions do not necessarily indicate that defendant was attempting to avoid apprehension and must be viewed in conjunction with defendant's other actions and mental health history, the court evidently credited Dr. Nadkarni's testimony that defendant's actions were a goal-directed attempt to avoid police and were not impelled by delusions.

¶ 67                              3. *Battle of the Experts*

¶ 68    Defendant contends, however, that the court erred in crediting Dr. Nadkarni's testimony over Dr. Dinwiddie's because, not only was Dr. Dinwiddie more qualified than Dr. Nadkarni, but Dr. Nadkarni also failed to review critical documents concerning defendant's mental health

history. Defendant contends that Dr. Nadkarni failed to review the Riverside Hospital records and failed to recall specific details about defendant's medication history. Defendant contends that the Riverside Hospital records were crucial to an accurate diagnosis because they showed that, one year prior to the incident, defendant had been involuntarily committed due to his mental illness. Defendant asserts that Dr. Dinwiddie explained the significance of these records, which provided a glimpse into defendant's behavior during a manic episode. Defendant contends that in such a situation, this case cannot be considered a "battle of the experts," where Dr. Dinwiddie's testimony was based on a complete review of defendant's medical history and Dr. Nadkarni's was not.

¶ 69    We observe that defendant raised these same arguments before the circuit court and the court determined that the Dr. Nadkarni's testimony was not less credible due to these alleged deficiencies. With regard to Dr. Dinwiddie being more qualified than Dr. Nadkarni, the court found that this was "an argument not in evidence." The court determined that it found Dr. Nadkarni to be an expert, and the court had listened to his testimony just as it had listened to Dr. Dinwiddie's testimony. The court also acknowledged that Dr. Nadkarni had not reviewed the records from Riverside Hospital. The court noted, however, that the evidence showed that defendant was brought to Riverside Hospital, where he stayed for two days, and was subsequently committed to Tinley Park Mental Health Center, where he stayed for seven or eight days. The court noted that Dr. Nadkarni had reviewed the medical records from Tinley Park Mental Health Center. The court observed, therefore, that, aside from the defendant's two-day stay at Riverside Hospital, Dr. Nadkarni had reviewed the same exact records as Dr. Dinwiddie but had reached a different conclusion about defendant's mental health. Despite these arguments by defendant, the court credited Dr. Nadkarni's testimony that defendant's actions were goal-

directed and that he was not suffering a manic episode at the time of the offense. It was within the court's discretion to accept Dr. Nadkarni's opinion over Dr. Dinwiddie's where Dr. Nadkarni's opinion was based on a credible diagnosis. *McDonald*, 329 Ill. App. 3d at 946.

¶ 70    Defendant, nonetheless, relies on *People v. Wilhoite*, 228 Ill. App. 3d 12 (1991), in support of his contention that the court should not have credited Dr. Nadkarni's testimony where he failed to review defendant's entire mental health history. In *Wilhoite*, defendant was charged with attempted murder after she tried to throw her nine-year-old daughter out the window of their apartment. *Id.* at 14. At defendant's bench trial, the defense expert testified that defendant suffered a brief psychotic episode brought about by the stress of learning that her boyfriend had molested her daughter. *Id.* at 17. The defense expert testified that defendant "believed the world was coming to an end and that God had commanded her to kill her children so that they could find peace in heaven." *Id.* at 23. The State's expert, however, testified that defendant's behavior could be explained by her marijuana use and diagnosed her with cannabis intoxication. *Id.* at 16. The trial court rejected defendant's insanity defense, finding the explanation of the State expert " 'more logical.' " *Id.* at 19.

¶ 71    In reversing the trial court's ruling as against the manifest weight of the evidence, this court noted that the State's expert never asked defendant, nor ever attempted to ascertain, how much marijuana she had smoked on the night of the incident. *Id.* at 21. The court also noted that the textbook source the State expert used as guidance in diagnosing defendant "virtually negate[d] his conclusion and supports those of defendant's experts." *Id.* at 22.

¶ 72    We find the court's reasoning in *Wilhoite* is distinguishable in a number of respects. First, although both the State and Dr. Nadkarni acknowledged that Dr. Nadkarni did not review the medical records from Riverside Hospital, he did review every other record, including the records

from Tinley Park Mental Health Center, which, as the trial court noted, was where defendant served his involuntary commitment. Secondly, Dr. Nadkarni, in addition to reviewing the same records as Dr. Dinwiddie with the exception of the Riverside Hospital records, actually interviewed defendant on two occasions, thus providing him with the opportunity to collect all of the information necessary to form his diagnosis, and there was no suggestion that the sources Dr. Nadkarni relied upon actually refuted his diagnosis, as there was in *Wilhoite*. Dr. Nadkarni's opinion was also supported by defendant's extensive mental health history where, as Dr. Nadkarni noted, no mental health professional had ever diagnosed defendant as having a major mental illness. We also observe that at the time *Wilhoite* was decided, defendant was required to prove her insanity by a preponderance of the evidence. *Id.* at 19-20 (citing Ill. Rev. Stat. 1987, ch. 38, ¶ 6-2(e)). Under that standard, defendant had to show only that it was " 'more likely than not that [s]he was insane when [s]he committed the offenses charged.' " *Id.* at 20 (quoting *People v. Moore*, 147 Ill. App. 3d 881, 886 (1986)). Here, by contrast, defendant was required to prove his insanity by "clear and convincing evidence." 720 ILCS 5/6-2(e) (West 2014). Thus, *Wilhoite's* applicability here is questionable in light of this higher evidentiary burden.

¶ 73    We also observe that the circuit court's determination of credibility was not affected by the fact that, during his testimony, Dr. Nadkarni was unable to recall the specific dates defendant was taking medication while he was at the Cook County jail. Although he was not able to recall the information on the stand, Dr. Nadkarni testified that he had reviewed the relevant medical records and had interviewed defendant on two occasions after the incident. Based on his review of defendant's mental health history, Dr. Nadkarni concluded that defendant was able to appreciate the criminality of his conduct at the time of the offense. The circuit court, having the opportunity to listen to the testimony of both experts and consider the other evidence presented,

including the same arguments defendant makes before this court regarding Dr. Dinwiddie's testimony, credited Dr. Nadkarni's testimony regarding defendant's mental health. As noted, it was within the province of the trier of fact to weigh the credibility of both experts and determine the weight to be given to their testimony. *McDonald*, 329 Ill. App. 3d at 946; *West*, 231 Ill. App. 3d at 650-51.

¶ 74                                    a. Defendant's Flight

¶ 75     Defendant next contends that the court erred in finding that defendant's flight after the offense is incontrovertible evidence on his criminal intent. In support of this contention, defendant relies on *Wilhoite*, in conjunction with *People v. Baker*, 253 Ill. App. 3d 15 (1993), and *People v. Kando*, 397 Ill. App. 3d 165 (2009). In *Baker*, four experts testified, each on behalf of defendant, that he could not appreciate the criminality of his conduct at the time of the offense. *Baker*, 253 Ill. App. 3d at 23-26. Nonetheless, the circuit court rejected defendant's insanity defense and found him guilty of the charged offense. *Id.* at 26. On review, this court recognized the trial court's authority to reject expert testimony and rely solely on lay testimony, but this court noted that the trial court did not give any reason for rejecting the expert witness testimony. *Id.* at 28. The appellate court observed that it did not find any basis for the trial court to reject the expert testimony, noting there was not a substantial disagreement among the four experts with regard to defendant's mental health and the credibility of the experts was bolstered by the fact that three of them were employed by the circuit court of Cook County's psychiatric institute and examined defendant pursuant to court order. *Id.* The court also rejected the State's argument that defendant's flight after the crime supported the trial court's finding. *Id.* at 31. The court noted that "[w]hile flight from a crime scene can be indicative of an attempt to prevent detection, such flight differs significantly from flight which is part of the defendant's insane

delusions or hallucinations." *Id.* The court noted that one of the experts testified that defendant fled because he was in fear for his own life, and the court found that this conclusion was supported by the undisputed evidence presented at trial as to defendant's paranoia and persistent fear of people pursuing him. *Id.* Thus, the court found that defendant's flight was consistent with the diagnoses of the experts that defendant was fleeing due to delusional paranoia after the offense. *Id.*

¶ 76    Similarly, in *Kando*, two experts testified, both on behalf of defendant, that defendant was insane at the time of the offense and could not appreciate the criminality of his conduct. *Kando*, 397 Ill. App. 3d at 176-92. The circuit court rejected the opinions of both experts and concluded that defendant was not insane at the time of the offense. *Id.* at 193, 195. On review, this court recognized the deference accorded to the trial court on the issue of an insanity defense but noted that, "[w]hile it is within the province of the trial court as the judge of the witness' credibility to reject or give little weight to *** expert psychiatric testimony, this power is not an unbridled one (*Baker*, 253 Ill. App. 3d at 30 ***), and a trial court may not simply draw different conclusions from the testimony of an otherwise credible and unimpeached expert witness (*People v. Arndt*, 86 Ill. App. 3d 744, 750 (1980))." (Internal quotation marks omitted.) *Kando*, 397 Ill. App. 3d at 196. The court found that it could find no basis for the trial court to reject the expert testimony where there was no substantial disagreement among the testifying experts. *Id.* at 197. The court also rejected the State's argument that defendant's flight from the scene supported a finding that he was sane at the time of the commission of the offense. *Id.* at 205. The court noted that defendant did not appear to flee to ward off detection or destroy evidence, but "[e]veryone agreed that instead of fleeing from the building[,] defendant returned to his

apartment in plain and open view, whereupon the arrival of the police, he immediately opened the door, led the officers to the bloody knife, and admitted to stabbing the victim." *Id.*

¶ 77 Both of these cases are distinguishable from the case at bar in several respects. Notably, in this case there was contradictory expert testimony presented. This was not a case where the circuit court rejected the unrebutted expert testimony of one party and relied solely on lay witness testimony as in *Kando* and *Baker*. The court's finding, that defendant's flight was further evidence that he could appreciate the criminality of his conduct, was not the basis of its ruling but rather was another representation of the fact that it accepted Dr. Nadkarni's testimony over Dr. Dinwiddie's, which, as discussed above, is within the trial court's prerogative. It is clear that the court credited Dr. Nadkarni's testimony that defendant's flight after the shooting, as well as his attempt to conceal Cardenis's vehicle in the parking garage, were goal-directed actions and were not the result of persecutory delusions.

¶ 78 In addition, we do not find *Wilhoite* comparable to the case at bar where in that case there was no evidence defendant fled after the offense but the testimony established that defendant was already in the process of fleeing prior to the crime as part of her delusion. *Wilhoite*, 228 Ill. App. 3d at 26. Here, by contrast, defendant did not attempt to flee until after the shooting. Moreover, in rejecting defendant's insanity defense, the court did not rely solely on the fact that he fled after the shooting but also based its ruling on the testimony of the police officers and other witnesses who described defendant's behavior at the time of the offense, as well as Dr. Nadkarni's testimony. Accordingly, we cannot say that the court impermissibly used the fact of defendant's flight in rejecting defendant's insanity defense, as defendant suggests.

¶ 79 b. Dr. Dinwiddie's Equivocal Testimony

¶ 80    Defendant also contends that the circuit court erred in finding Dr. Dinwiddie's testimony "equivocal." Although defendant takes issue with this characterization, the court gave examples from the trial transcript of portions of Dr. Dinwiddie's testimony that it found to be equivocal. Specifically, the court cited responses by Dr. Dinwiddie where he indicated that defendant fled the scene of the incident, not because he was aware he had committed a crime, but "out of a sense of self-preservation from delusional grounds." The court commented that Dr. Dinwiddie's responses did not make sense. The court also noted that, with regard to defendant leaving his white sweatshirt at the El Tunel club, Dr. Dinwiddie testified that "the white coat is very interesting. Is that an example of somebody who is aware that it's easily identifiable and tries to set a false trail? Possibly. It's also consistent with somebody who is manic, impulsive, giving things away." The court noted that this response was typical of the way Dr. Dinwiddie testified throughout his testimony. The court then reviewed the evidence and determined, contrary to Dr. Dinwiddie's opinion, that defendant was acting in a goal-driven manner, as Dr. Nadkarni testified. Thus, the court did not merely issue a blanket criticism of Dr. Dinwiddie's testimony, but provided specific examples that it deemed equivocal. As noted, it was within the province of the circuit court to judge the credibility of the witnesses and determine the weight to be assigned to their testimony. *West*, 231 Ill. App. 3d at 650-51; *Gilmore*, 273 Ill. App. 3d at 1000. It is not our function on review to independently reweigh the testimony. Based on the record before us, we cannot say that the court's ruling rejecting defendant's insanity defense was against the manifest weight of the evidence.

¶ 81                    B. Trial Judge Assumed Role of Prosecutor and Judicial Bias

¶ 82    Defendant next contends that the trial judge improperly assumed the role of the prosecutor in questioning Dr. Dinwiddie. Defendant maintains that the trial judge's questions

went beyond mere clarification of the facts and his examination revealed that he was seeking to support his own belief that defendant was sane. Defendant also asserts that the trial judge was biased, as evidenced by his reliance on Dr. Dinwiddie's responses to his questions in finding his testimony "equivocal" and in failing to question Dr. Nadkarni in the same manner. Defendant further contends that the trial judge's bias was evidenced by the fact that he failed to credit Mandy's testimony, interrupted defense counsel during closing argument, and mischaracterized Dr. Dinwiddie's testimony regarding bizarre and nonbizarre delusions in issuing his ruling.

¶ 83                                   1. *Forfeiture*

¶ 84     Initially, we note that the State contends that defendant has forfeited this issue for review, where counsel failed to object to the trial court's questioning of Dr. Dinwiddie at trial and failed to raise the issue in a posttrial motion. The State is correct that, in order to preserve an issue for appeal, defendant must both make an objection at trial and raise the specific issue in a posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Omission of either of these steps results in waiver of the issue. *Id.* We observe, however, that in his posttrial motion, defendant contended that the court "conducted a lengthy examination of *** Dr. Dinwiddie, and indicated during the finding of guilt that the court based their opinion at least in part based on that examination." This contention was part of three contentions raised in the motion for a new trial concerning the trial judge's bias. Thus, we find that defendant did raise the issue in a posttrial motion. We also note that defense counsel did not object while the trial judge was questioning Dr. Dinwiddie, but defense counsel did object during the trial court's ruling while he was discussing Dr. Dinwiddie's response to his questions. Although defendant did not object to the specific questioning he now challenges on appeal, the supreme court has recognized that the application of the forfeiture rule is less rigid where the basis for the objection is the trial judge's conduct.

*People v. Kliner*, 185 Ill. 2d 81, 161 (1998); see also *People v. Davis*, 378 Ill. App. 3d 1, 10 (2007) ("The reason for relaxing the waiver rule is that the objection would have fallen on deaf ears."). Accordingly, we find that defendant did not forfeit this claim of error and we may consider defendant's contentions.

¶ 85                                    2. *Role of Prosecutor vs. Bias*

¶ 86    Defendant's claim of judicial bias is, in fact, multifaceted. Defendant first contends that the trial judge assumed the role of the prosecutor in questioning Dr. Dinwiddie. Defendant also contends that the trial court was biased against defendant. Defendant points to several instances in the record that he contends demonstrate the trial court's bias, such as mischaracterizing Dr. Dinwiddie's testimony, ignoring Mandy's testimony about defendant's 2009 psychotic episode, and interrupting defense counsel during closing argument. Although defendant argues the issues together, they are separate contentions requiring different analyses and different standards of review. However, given the nature of the contentions, they are necessarily intertwined. We will first address defendant's claim that the trial judge improperly assumed the role of the prosecutor and then address defendant's claims of judicial bias.

¶ 87                          3. *Trial Judge's Questioning of Dr. Dinwiddie*

¶ 88    It is well settled that a trial judge has discretion to question a witness " 'to elicit the truth or to bring enlightenment on material issues which seem obscure,' " so long as he does so in a fair and impartial manner. *People v. Smith*, 299 Ill. App. 3d 1056, 1062 (1998) (quoting *People v. Wesley*, 18 Ill. 2d 138, 154-55 (1959)). We also observe that a trial judge does not " 'assume the role of prosecutor merely because [his] questions solicit evidence material to the State's case.' " *Id.* (quoting *People v. Sutton*, 260 Ill. App. 3d 949, 959-60 (1994)). "[I]t is an abuse of discretion for a trial judge to assume the role of an advocate," and "[t]he appropriate scope of

questioning is determined by the facts and circumstances of the case."[3] *People v. Taylor*, 357 Ill. App. 3d 642, 647 (2005). Where, as here, defendant was tried without a jury, defendant can show prejudice where the "tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence." *Smith*, 299 Ill. App. 3d at 1063.

¶ 89    Here, following Dr. Dinwiddie's lengthy testimony in defendant's case-in-chief, the court asked Dr. Dinwiddie about the "policeman at the elbow test," which Dr. Dinwiddie mentioned during cross-examination. Dr. Dinwiddie acknowledged that test was not the law in Illinois. The court then asked Dr. Dinwiddie about what defendant told him with regard to "the Cardenas [*sic*] incident." The court asked him about the series of events that led up to defendant forcing Cardenis and his brother-in-law out of the vehicle at gunpoint and asked whether he believed defendant was suffering from "some psychotic episode when he did all of that." Dr. Dinwiddie replied that he did, and the court then asked Dr. Dinwiddie a series of questions about what he knew about events leading up to the shooting of Officer Aaron Davis and what defendant had told him about the incident. The court also asked Dr. Dinwiddie a series of questions about which of defendant's medical records he had reviewed and asked him if he had also spoken to Mandy.

¶ 90    The court then asked:

---

[3]We observe that defendant asserts, relying on *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003), that in determining whether "a judge overstepped the boundaries of judicial propriety in questioning a witness," our review should be *de novo*. However, this is an inaccurate representation of the analysis in *Stevens*. *Stevens* did not even consider the issue of a trial judge's questioning of a witness. Rather, in that case, the trial judge repeatedly interrupted defense counsel during closing argument, imposed a time limit on defense counsel's closing argument, and remarked, before defense counsel completed closing argument, that " 'I'm as clear as can be and convinced as can be that the State has proven [that defendant committed the offense.]' " *Id.* On review, this court determined *de novo* review was appropriate where the trial court essentially deprived defendant of his sixth amendment right to the assistance of counsel. *Id.* Thus, the situation here bears little similarity to *Stevens*, and we find *de novo* review is not appropriate on this issue.

"Q. If a person, if Mr. Romero was trying to flee the scene of the crime to avoid apprehension after he shot the policeman, and if Mr. Romero did not want to go to the home of his aunt because he feared he would be apprehended at that location, is that not an indication that he understood he committed a crime?"

Dr. Dinwiddie replied that it was a consideration but that he would have to consider other possibilities. Dr. Dinwiddie stressed that it was important to consider that defendant's behavior had been characterized by persecutory delusions and fear for his safety and his life. Dr. Dinwiddie noted that defendant believed the policeman was reaching for his gun before defendant shot him. Dr. Dinwiddie explained that this was obviously a self-serving statement but "another possibility is that he delusionally interpreted a perfectly benign act as being a threat." Dr. Dinwiddie also acknowledged that defendant's behavior after the shooting could indicate an awareness of the wrongfulness of his actions but could also indicate that defendant was acting on delusional fears for his safety, so that defendant was not fleeing the scene out of a sense of guilt "but out of a sense of self-preservation from delusional grounds." Dr. Dinwiddie concluded that

"the best way I can put this together is actually going back a year before the incident and noticing that he had a classic manifestation of a typical mental illness at that time. And there's things that we know about the course of that mental illness, that it relapsed and there was independent good evidence in my opinion of active mental illness for at least weeks, several weeks prior to the incidents. And the severity seems, as is typical of the illness, to have—to have gotten more intense as time went on. So even keeping in mind that this is a man who is not as respectful of social institutions as we would like, to me the simplest hypothesis that explains the facts, is that all of this can be—all of these things, in my opinion, can be subsumed under the heading of mental illness without any

particularly special pleadings. I've thought about it a lot, and I think that makes the most clinical sense."

Finally, the court asked Dr. Dinwiddie if it were possible, as Dr. Dinwiddie had just told the State's Attorney, that someone could be in a manic state and still appreciate the criminality of his acts. Dr. Dinwiddie responded that "yes, absolutely the case is most of the time that is true, even in mania, absolutely correct."

¶ 91    Defendant contends that these questions by the trial court went beyond seeking mere clarification of Dr. Dinwiddie's testimony and instead demonstrate that the trial judge was seeking to elicit testimony from Dr. Dinwiddie that was consistent with his belief that defendant was sane at the time of the offense. Despite defendant's contentions to the contrary, we fail to see how the trial judge's questions indicate that he had prejudged the case. Rather, the trial judge's inquiries focused on what defendant had told Dr. Dinwiddie during their interview and whether Dr. Dinwiddie had reviewed all of the applicable evidence in forming his opinion. The court also sought to clarify Dr. Dinwiddie's opinion on defendant's actions after the shooting. Although defendant asserts that the trial judge's questions were "carefully crafted" to refute Dr. Dinwiddie's testimony, the record contradicts this contention.

¶ 92    Defendant points to the court's question asking if Dr. Dinwiddie was aware that defendant gave his white hooded sweatshirt to someone at the nightclub before the police came. Dr. Dinwiddie replied that he was not aware of that fact, but defendant contends that this question "betray[ed] the court's determination that [defendant] had purposefully given this item away to avoid police detection." We believe this is a mischaracterization of the trial judge's intentions, given the other questions the trial judge asked Dr. Dinwiddie. Before asking him about the white sweatshirt, the trial judge asked Dr. Dinwiddie if defendant had told him about

stealing the two cars after the shooting. The court asked Dr. Dinwiddie if defendant did those things so that he could flee the scene, and Dr. Dinwiddie replied that he did. After asking about the white sweatshirt, the trial judge asked Dr. Dinwiddie what medical records he had reviewed. Thus, the trial judge's questions do not suggest that he had prejudged the case but rather illustrate an attempt " 'to elicit the truth or to bring enlightenment on material issues which seem obscure.' " *Smith*, 299 Ill. App. 3d at 1062. This was a case involving complex psychiatric testimony, defendant's long mental health history, and two experts with different opinions. In such a case, we do not find it improper for the trial judge to ensure that the expert's opinion was based on all of the relevant evidence and to seek clarification regarding the expert's opinion. Here, the trial judge appeared to be chiefly concerned with Dr. Dinwiddie's testimony regarding whether he believed defendant fled the scene due to his delusions or in an attempt to avoid apprehension by police. The trial judge first ensured that Dr. Dinwiddie's testimony was based on a complete consideration of the appropriate evidence and then sought to clarify Dr. Dinwiddie's testimony on the issue. Based on the record before us, we cannot say that such questioning was inappropriate or suggests that the trial court had assumed the role of the prosecutor and prejudged the case.

¶ 93    Nevertheless, defendant contends that the trial judge also assumed the role of the prosecutor when he interrupted the State's cross-examination of Dr. Dinwiddie during surrebuttal to ask his own questions. In response to one of the State's Attorney's questions, Dr. Dinwiddie testified that defendant believed his phone was being tapped and that "there are cars or helicopters following him." The court interrupted to point out that up to this point in the trial, the court had not heard any testimony about defendant believing his phone was tapped or that he was being followed by helicopters. The court then asked Dr. Dinwiddie about this testimony.

"Q. In the three days that we've been going on with this. Did he tell you that he thought his phone was being tapped?

A. Yes. This was all part of the evaluation. And I mean, it's kind of conclusory in the report, but that's part of the basis for my belief that this stuff is more than simply, you know, a reasonable fear of somebody who lives the gang life. There's a lot more that— this is why I'm—it's these associated things that make me—

Q. Did he tell you that he thought he was being followed by helicopters?

A. At this point I can't recall whether he told that directly during the evaluation, whether that was information elicited by my fellow at that time and discussed, but that was information that I relied upon in reaching these opinions."

When the State's Attorney continued to question Dr. Dinwiddie about defendant's belief that he was being followed by helicopters, the court directed the State's Attorney to continue with the cross-examination because Dr. Dinwiddie had to leave.

¶ 94    Defendant contends that these questions by the judge displayed hostility to the defense expert by suggesting that he was trying to hide something from the parties. Based on the record before us, we find defendant's claim unpersuasive. Rather than showing hostility as defendant suggests, the court's questioning shows that it was surprised by this new information about defendant coming to light only on defendant's surrebuttal. At this point in the proceedings, defendant had two pretrial fitness hearings, where two different experts had testified, Dr. Dinwiddie and Mandy had testified at length about defendant's mental health history in defendant's case-in-chief, and Dr. Nadkarni had testified as the State's rebuttal witness. At no point during the proceedings had any witness mentioned that defendant believed he was being followed by helicopters or that his phone was being tapped. Although defendant contends that it

was for the State's Attorney to cross-examine Dr. Dinwiddie about this testimony, we see no impropriety in the court's questioning and find that the court did not abuse its discretion in questioning Dr. Dinwiddie. *Taylor*, 357 Ill. App. 3d at 647.

¶ 95                                    4. *Judicial Bias*

¶ 96    We next address defendant's claim that the trial judge displayed bias against him. A trial judge is presumed to be impartial, and the party challenging the judge's impartiality bears the burden of overcoming this presumption. *People v Faria*, 402 Ill. App. 3d 475, 482 (2010). "Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." *Id.* In order to show bias, defendant must demonstrate that the judge displayed "active personal animosity, hostility, ill will, or distrust toward the defendant." *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010) (citing *People v. Hooper*, 133 Ill. 2d 469, 513 (1989)). We review *de novo* the question of whether the trial judge's conduct requires reversal of the judgment. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 97                              a. Dr. Dinwiddie's Responses

¶ 98    Defendant first contends that the trial judge's bias is evidenced where he relied on Dr. Dinwiddie's responses to his questions in rendering its verdict. We note that there is nothing improper about the trial judge relying on Dr. Dinwiddie's responses to his questions in issuing his ruling. If anything, this suggests that the trial judge had not prejudged the case when he questioned Dr. Dinwiddie and relied on his responses in determining his ruling. As discussed above, the trial court's questioning was not improper, and Dr. Dinwiddie's responses were part of the record and were, therefore, proper evidence for the court to consider in rendering its judgment. As noted, a trial judge does not " 'assume the role of prosecutor merely because [his]

questions solicit evidence material to the State's case.' " *Smith*, 299 Ill. App. 3d at 1062 (quoting *Sutton*, 260 Ill. App. 3d at 959-60). We therefore find no indication of bias in the trial judge's ruling.

¶ 99                              b. Failure to Question Dr. Nadkarni

¶ 100   Defendant next contends that the court's failure to question Dr. Nadkarni in the same manner it had questioned Dr. Dinwiddie was evidence of its bias. We find this argument unpersuasive. Dr. Nadkarni had previously testified at defendant's second pretrial fitness hearing, thus it is not surprising that the court would already be aware of what records Dr. Nadkarni had reviewed and whether Dr. Nadkarni was familiar with the facts of the case. Moreover, and perhaps more importantly, as discussed above, in raising an insanity defense, the burden is on defendant to show by clear and convincing evidence that at the time of the offense he could not appreciate the criminality of his conduct. Thus, in proving this defense, the testimony of the defense expert is paramount to defendant's case. Further, as noted, it is within the trial judge's discretion in determining whether to question a witness. *Id.* We cannot say that the decision to question one expert but not question another expert represents an abuse of that discretion. Accordingly, we find that the trial judge's decision to not question Dr. Nadkarni does not indicate the trial judge was biased against defendant.

¶ 101                                 c. Mandy's Testimony

¶ 102   Defendant next contends that the trial judge's bias was evidenced by his failure to credit Mandy's testimony that, in the weeks leading to defendant's 2009 involuntary commitment, he suffered a delusion that she was trying to kill him with their infant son's urine. We observe that despite defendant's contentions that this demonstrates the trial judge's bias, this argument is more accurately considered as a challenge to the trial judge's determination of the credibility of

the witnesses and the weight to be given their testimony. It is axiomatic that in a bench trial such determinations are within the province of the trial judge, as the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). The weight to be given Mandy's testimony and the reasonable inferences to be drawn from that testimony were matters for the trial judge, as the trier of fact. Here, the record shows that the trial judge considered all of the evidence presented, including the testimony of the witnesses and defendant's medical records, and ultimately determined that defendant failed to meet his burden of proving by clear and convincing evidence that he was unable to appreciate the criminality of his conduct at the time of the offense. Defendant's contention that this finding was biased because the trial judge failed to specifically mention Mandy's testimony in its ruling is, therefore, unpersuasive.

¶ 103                                   d. Closing Argument

¶ 104   Defendant next contends that when the trial judge interrupted defense counsel during closing argument, this demonstrated further evidence of the trial judge's bias. During closing argument, defense counsel stated:

> "[DEFENSE COUNSEL]: Dr. Dinwiddie has been extremely clear. He is an expert who's experienced in certification, peer review, reputation. Those can't be denied. Just because Doctor—
>
> THE COURT: I don't know of any evidence of his reputation, by the way, but go ahead.
>
> [DEFENSE COUNSEL]: Well, you are aware that he is a professor at Northwestern University.
>
> THE COURT: I know, but what does—because he's hired at Northwestern, that's not evidence of his reputation. It's where he works.

[DEFENSE COUNSEL]: Well, his peer reviewed articles certainly would be as opposed to Dr. Nadkarni's zero articles or anything that is peer reviewed by anybody except just the court. And apparently Dr. Nadkarni didn't feel like he needed to look at all the documentation. He didn't do so. That's not disputed. It's not disputed by him.

THE COURT: You're starting to repeat yourself, [defense counsel]. Do you have anything else?"

¶ 105    Again, we fail to see how this exchange supports defendant's claim of judicial bias. Defendant contends that the trial judge's remark "belittled" Dr. Dinwiddie. We note that remarks belittling or demonstrating hostility to defense counsel may prevent the defendant from receiving a fair trial. *People v. Harris*, 123 Ill. 2d 113, 137 (1988). However, the fact that a judge displays displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel. *People v. Urdiales*, 225 Ill. 2d 354, 426 (2007) (citing *People v. Jackson*, 205 Ill. 2d 247, 277 (2001)). Here, the judge merely commented that there had been no evidence of Dr. Dinwiddie's reputation, *i.e.*, how his peers regard him, and the trial judge did not find Dr. Dinwiddie's credentials and place of employment sufficient evidence of his reputation. We cannot say that these comments by the judge evidenced any bias.

¶ 106                                  e. The Circuit Court's Ruling

¶ 107    Finally, defendant contends that the trial court mischaracterized Dr. Dinwiddie's testimony in rendering its verdict, which was further evidence of its bias. Specifically, defendant points to Dr. Dinwiddie's testimony that an example of a "bizarre delusion" is one where "the devil is after me or the Martians are going to eat my brains or something." In rendering its judgment, the circuit court repeated this testimony on four occasions. With regard to defendant's 2009 treatment at Riverside Hospital and Tinley Park Mental Health Center, the court found that

defendant was becoming increasingly paranoid because he was afraid of retaliation from the Latin Kings for things that happened while he was a gang member, "[n]ot because of some delusional thought that the Martians are chasing him and they're going to eat his brains but the very real fear that he could at some point be set upon by some very evil men ***." Later, the court stated that defendant "told Dr. Dinwiddie he didn't go to his aunt's house after he got the car [after the shooting] because he feared being caught by police. He didn't fear being caught by the Martians who were going to eat his brain."

¶ 108 The court also stated that defendant shot Officer Aaron Davis because he did not want to be apprehended. "Not because the Martians were coming to eat his brain, not because he was suffering some persecutory delusion. There were no Latin Kings out there." Finally, the court stated that when defendant attempted to steal the van after the shooting: "Was the man in the van one of the Martians trying to eat his brain or was he—." At that point, defense counsel interrupted the court:

"[DEFENSE COUNSEL]: Judge, I would really object to your ruling indicating the Martians. That was not Dr. Dinwiddie's testimony. That was an example given and that was not the argument by the defense.

THE COURT: Okay. I didn't—

[DEFENSE COUNSEL]: And that's the fourth time that it's been brought up in your ruling.

THE COURT: I didn't interrupt you but to remind you that you're starting to repeat yourself.

[DEFENSE COUNSEL]: As are you, Judge.

THE COURT: I beg your pardon? I beg your pardon? What are you trying to do right now? Are you trying to make a record for the Appellate Court by criticizing me?

[DEFENSE COUNSEL]: I think the record is very clear for the Appellate Court, Judge. I'm not trying to do anything additional."

The court concluded, with regard to defendant's attempts to flee the scene of the incident:

"Now did he do these things because he was suffering from some persecutorial delusion or some other delusion or did he do these things to escape the very serious problems that he had created for himself? I find that the evidence suggests that all of this behavior was goal-directed and that was to avoid apprehension ***."

¶ 109 Defendant contends that these comments show the "trial judge's conclusion that a person cannot be psychotic unless he is experiencing a bizarre delusion that he is being chased by brain eating Martians." We find that this is a mischaracterization of the court's ruling.

¶ 110 As defendant correctly points out, Dr. Dinwiddie gave the example of a brain-eating Martian as a bizarre delusion, a delusion which requires no further "homework" because it is not based on reality. When questioning Dr. Dinwiddie, the trial judge asked him why defendant would flee the scene of the incident. Dr. Dinwiddie responded that defendant's behavior after the shooting could indicate an awareness of the wrongfulness of his actions but could also indicate that defendant was acting on delusional fears for his safety, so that defendant was not fleeing the scene out of a sense of guilt "but out of a sense of self-preservation from delusional grounds." In issuing its ruling, the court implicitly rejected Dr. Dinwiddie's opinion that defendant was fleeing "out of a sense of self-preservation from delusional grounds" and instead determined, as Dr. Nadkarni testified, that defendant was aware of the wrongfulness of his actions and was attempting to avoid apprehension. The trial court did not cite the example of brain-eating

Martians to suggest that would be the only circumstance where it would find defendant was insane at the time of the offense, but to illustrate the court's determination that defendant fled because he appreciated the criminality of his conduct and not because he was fearful of some persecutory delusion, whether bizarre or nonbizarre. As the court noted, when defendant fled there were no Latin Kings, and there were no brain-eating Martians; defendant's flight was not impelled by a delusion. Rather, the court determined that defendant's actions were best explained by Dr. Nadkarni's testimony that his actions were goal-directed and he was fleeing to avoid apprehension. At base, "a defendant is entitled to a fair trial and not a perfect trial." *Faria*, 402 Ill. App. 3d at 482. Although defendant's trial may not have been perfect, there is nothing in the record to suggest that it was not fair. Accordingly, we find that defendant has failed to overcome the presumption that the trial judge was impartial.

¶ 111                    C. Mandy's Testimony of Defendant's Statements

¶ 112   Finally, defendant contends that the circuit court denied him his constitutional right to present a defense where it prohibited Mandy from testifying to statements defendant made prior to the incident and prior to his 2009 psychotic episode. Defendant contends that the court erred in finding that these statements were hearsay where they were not offered for their truth but were offered to show defendant's state of mind. Defendant contends that these statements were extremely relevant to his defense that he was not able to appreciate the criminality of his conduct at the time of the offense.

¶ 113                    1. *Forfeiture and Plain Error*

¶ 114   As defendant acknowledges, he has forfeited this issue for review by failing to object at trial and failing to include this issue in his posttrial motion. Defendant contends that we should

nonetheless review this issue under the plain error rule. In the alternative, defendant contends that his counsel was ineffective in failing to preserve the issue for appeal.

¶ 115   The plain error rule allows a reviewing court to consider unpreserved claims of error regardless of forfeiture. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Plain error applies when there is a clear or obvious error and the evidence is so closely balanced that the error would change the outcome of the case or when there is a clear or obvious error that is so serious that it affected the fairness of defendant's trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). Defendant contends that both prongs of the plain error analysis could apply to our review of this issue. The first consideration in addressing defendant's plain error argument is determining whether an error occurred, which requires a " ' "substantive look" ' " at the issue. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008).

¶ 116                    2. *Admission of Hearsay Evidence*

¶ 117   "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). Defendant contends that Mandy's statements fell within one of the exceptions to the rule against hearsay and the court erred in excluding her testimony. Whether or not to admit evidence is within the sound discretion of the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). We will not disturb the trial court's decision on the admission of evidence absent an abuse of that discretion. *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 49. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 118   Defendant contends that, although evidentiary rulings are typically reviewed for abuse of discretion, where, as here, the court's ruling is based on an erroneous rule of law, we should review the issue *de novo*. Defendant is correct that reviewing courts may review evidentiary issues *de novo* where " 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999)). However, we do not find this to be such a case. There is no indication in the record that the trial court misapplied a rule of law; it merely sustained the State's Attorney's objections when Mandy began to testify to what defendant said and directed her to testify as to what happened, not what defendant said. In ruling on evidentiary issues, the trial court must consider a number of circumstances, such as the reliability of the evidence and prejudice. *Id.* In this case, it is clear that trial court exercised its discretion in making these evidentiary rulings; "*i.e.*, the court based these rulings on the specific circumstances of this case and not on a broadly applicable rule." *Id.* at 89-90. Accordingly, we will review the court's evidentiary rulings for abuse of discretion.

¶ 119                                    3. *Mandy's Excluded Testimony*

¶ 120   During Mandy's testimony, defense counsel asked her about defendant's behavior in the hospital after their son was born. Mandy testified that she was unable to move because she required additional surgeries. She testified that defendant "came into the room with me, he started saying there were people outside of our room—." The court then sustained the State's objection to that testimony and declared it stricken. Later, defense counsel asked Mandy about her discharge from the hospital. Mandy testified that defendant "wouldn't let us go home. He said that there was people trying to get us." The State objected to Mandy's testimony about what defendant said, and the court struck that testimony as well.

¶ 121    Mandy then testified about defendant's condition in June and July 2010.

> "Q. Okay, so June to July?
>
> A. There was one time we were in our room he's looking out the window and he kept saying that this lady, Sandy, was driving by—
>
> [STATE'S ATTORNEY]: Objection, Judge.
>
> THE COURT: The conversation is stricken.
>
> Q. Okay. He made some comments to you while he was looking out the window?
>
> A. He made comments that there was a lady driving [past]—
>
> [STATE'S ATTORNEY]: Objection.
>
> THE COURT: Sustained.
>
> Q. He made some comments?
>
> A. Yes.
>
> Q. And to your knowledge what he was telling you, was that true?
>
> A. No."

Defense counsel also asked Mandy about a phone call between her and defendant on the day of the offense.

> "Q. Did [defendant] call you at any point?
>
> A. He had called me that morning actually and told me that he wanted a divorce.
>
> [STATE'S ATTORNEY]: Objection.
>
> THE COURT: Strike what he told her.
>
> Q. You received a phone call, a message from him?
>
> A. He called me that morning.

> Q. You spoke to him?
>
> A. Yes.
>
> Q. You didn't have any indication of what was going on?
>
> A. I could tell that he wasn't right.
>
> Q. Had he acted the way he acted on the phone with you ever previously?
>
> A. He had been, he had been—how would I say it? I could tell he was completely off his meds. The rambling, the accusing me of things. I was supposedly having an affair. Just—It was not a pleasant conversation and it was basically good-bye."

¶ 122 Defendant contends that these rulings by the circuit court would have shown defendant's state of mind during the 2009 psychotic episode and in the months preceding the 2010 incident. Defendant contends that through Mandy's testimony, he was trying to show his "diseased thought process" at the time of a psychotic episode. Defendant contends that these statements were not hearsay because they would have shown defendant's state of mind and were not offered for the truth of the matter asserted and that the court erred in excluding them. Defendant contends that these rulings prevented him from adequately presenting his insanity defense.

¶ 123 Here, it is clear that the court was willing to permit Mandy to testify regarding defendant's actions and appearance but was precluding her from testifying as to his statements. Defendant contends that this prevented him from introducing vital evidence that would have bolstered his insanity defense by showing his state of mind during a psychotic episode, but the court's rulings did not seem to prevent defendant from introducing this evidence; it merely prevented Mandy from testifying regarding defendant's statements. As discussed, the circuit court has wide latitude in determining whether to admit evidence. See *Becker*, 239 Ill. 2d at 234; *Littleton*, 2014 IL App (1st) 121950, ¶ 49.

¶ 124    Moreover, the record shows that defendant was not prevented from presenting evidence of his state of mind even though these statements were excluded. The court permitted Mandy to testify extensively about defendant's behavior after the birth of their son and about defendant's condition during his treatment at the Helen Wheeler Center. The court also permitted Mandy to testify that, prior to defendant's 2009 involuntary commitment, he was rambling and paranoid and, prior to the 2010 incident, he called her and she could tell he was not taking his medication because he was rambling and accusing her of things that were not true. The court properly admitted this evidence while it excluded the largely irrelevant statements that defendant asked Mandy for a divorce, that defendant thought somebody named Sandy was driving down the street, and that he thought people trying to get them. " 'A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature.' " *People v. Enis*, 139 Ill. 2d 264, 281 (1990) (quoting *People v. Ward*, 101 Ill. 2d 443, 455 (1984)). Defendant was also permitted to present evidence of his state of mind through the testimony of Dr. Dinwiddie, who had interviewed defendant and Mandy, and through the doctors' testimony regarding defendant's medical records and medical history, all of which showed his state of mind prior to his 2009 involuntary commitment and prior to the incident. Accordingly, we cannot say that the trial court abused its discretion in sustaining the State's objections to Mandy's testimony of defendant's statements.

¶ 125    Nonetheless, defendant asserts that the trial court contradicted itself in a ruling, first allowing Mandy to testify about defendant's statement and then later reversing itself. Defendant points to a portion of Mandy's testimony where defense counsel asked her about defendant's reaction to their infant son urinating in the bed in September 2009.

"Q. What happened?

A. My son urinated on the bed and my husband was upset and thought I was trying to kill him with our son's urine.

[STATE'S ATTORNEY]: Objection, Judge.

THE COURT: I'm going to allow it to stand."

Defendant contends that this ruling contradicted a subsequent ruling of the court where defense counsel asked Mandy:

"Q. And did he have a response to you washing the sheets with his worksheets [*sic*]?

A. Yes. He came down, took everything out of the washer, threw it on the floor sopping wet, then ran outside in his boxers and boots, work boots and looked around, was looking in the bushes and telling me that there was somebody outside and that I was trying to kill him with the urine—

[STATE'S ATTORNEY]: Objection.

THE COURT: Don't talk about what he said, just what he did."

¶ 126 Contrary to defendant's contentions, this ruling shows the court's consistent decision to allow Mandy to testify as to what defendant did and how he acted but to prevent her from testifying to statements he made. As discussed, such a decision was within the discretion of the circuit court, and we find that the circuit court did not abuse its discretion in precluding this testimony.

¶ 127 Finally, we find defendant's reliance on *People v. Vanda*, 111 Ill. App. 3d 551 (1982) unpersuasive. In *Vanda*, defendant Vanda was found guilty of murder, and the sole issue at trial was whether defendant should be found not guilty by reason of insanity. *Id.* at 555. At trial,

defendant sought to introduce letters he had written to his parents and to the attorneys who had represented him on a prior murder charge. *Id.* The letters "contained defendant's false representations that he was acting in authoritative positions within the prison, such as helping the superintendent run the jail or serving as a fireman and being injured while putting out fires at the jail." *Id.* at 555-56. The trial court refused to allow the letters into evidence, finding that they were inadmissible hearsay and " 'self-serving.' " *Id.* at 556.

¶ 128   On appeal, this court reversed the circuit court's ruling, finding that the letters were relevant to defendant's insanity defense and were not hearsay statements because the letters were not offered to prove the truth of their contents. *Id.* at 556-57. The court also found that the letters should not have been excluded merely because they were " 'self-serving.' " *Id.* at 558. We find the unique factual circumstances present in *Vanda* distinguishable from the case at bar.

¶ 129   In *Vanda*, the letters offered were the only evidence defendant presented to show his mental state at the time the letters were written.[4] In contrast, here, defendant was allowed to present Mandy's extensive testimony regarding defendant's actions prior to the offense, Dr. Dinwiddie's testimony regarding his interviews with defendant and Mandy and his review of defendant's medical records, and the doctors' testimony regarding defendant's medical history, which detailed his state of mind at the time of his treatment. The only evidence the court precluded defendant from presenting was Mandy's testimony of defendant's specific statements that he made to her at the time.

¶ 130   The situation here was thus unlike *Vanda*, where defendant in that case was prevented from introducing the only evidence of his state of mind at the time he wrote the letters at issue.

---

[4]As the court noted, in most instances, defendant offered the actual letters into evidence, but he also sought to have his mother testify regarding the contents of letters he had written to her that had been destroyed. *Vanda*, 111 Ill. App. 3d at 556.

Accordingly, we cannot say that the trial court abused its discretion in excluding the proposed testimony. We thus find no error warranting plain error review and honor defendant's forfeiture of this issue. See *People v. Johnson*, 238 Ill. 2d 478, 491 (2010). We likewise find defendant's claim of ineffective assistance of counsel unavailing. "[I]f the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Evans*, 186 Ill. 2d 83, 94 (1999). Prejudice occurs where defendant demonstrates a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). As discussed, we find that the trial court did not err in excluding Mandy's testimony, and we therefore find no prejudice as a result of defense counsel's alleged deficient performance.

¶ 131                                    III. CONCLUSION

¶ 132    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 133    Affirmed.