Docket No. 104470.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM A. HUDSON, Appellant.

*Opinion filed March 20, 2008.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, Garman, and Burke concurred in the judgment and opinion.

## OPINION

The defendant, William Hudson, was charged in the circuit court of Adams County with home invasion (720 ILCS 5/12–11(a)(2) (West 2004)) (count I) and attempt (kidnapping) (720 ILCS 5/8–4(a), 10–1(a)(2) (West 2004)) (count II). A jury found defendant guilty of home invasion, but was unable to reach a verdict on attempt (kidnapping). Defendant was subsequently sentenced to 20 years in prison. He appealed, arguing that (1) psychological injury does not satisfy the "injury" element of the offense of home invasion; (2) the evidence was insufficient to show that he intended to harm the victim, Megan Walker; (3) the evidence was insufficient to prove that Walker suffered psychological harm; and (4) the circuit court denied him a fair hearing on his posttrial claims of ineffective assistance of trial counsel.

The appellate court rejected defendant's first three contentions, affirming the judgment of the circuit court in part. However, the appellate court vacated the circuit court's judgment insofar as it denied defendant's posttrial motions, and the appellate court ordered the cause remanded for further proceedings in that regard. No. 4–06–0181 (unpublished order under Supreme Court Rule 23). We granted defendant's petition for leave to appeal. 210 Ill. 2d R. 315.

On appeal, defendant argues that (1) the trial court erred in allowing the prosecution to present evidence of psychological trauma and instructing the jury that evidence of psychological trauma could satisfy the injury element of the offense of home invasion, and (2) assuming, *arguendo*, proof of psychological trauma can be so used, the State's evidence was insufficient to prove psychological harm where no expert testimony was presented. We will set forth those facts relevant to our disposition.


BACKGROUND

An amended information was filed in this case on April 27, 2005, charging defendant with home invasion and attempt (kidnapping). Count I, charging home invasion, alleged that defendant, who was not a police officer acting in the line of duty, knowingly and without authority entered the dwelling place of Megan Walker, that he remained there until he knew or had reason to know that Walker was present, and he intentionally caused injury to her. Defendant was tried before a jury on August 10, 2005.

Sixteen-year-old Megan Walker testified that, in April of 2005, she lived at 913 Chestnut Street in Quincy, Illinois, with her mother, Theresa Clowers, and her stepfather. In the early morning hours of April 26, 2005, the family's pet bird started making a lot of noise and Megan went to the kitchen to investigate. When she turned on the light, she saw a man (later identified as defendant) standing in the kitchen, close to the back door. He was wearing a shirt, but was not wearing pants. Megan had never seen him before.

Megan asked him who he was and what he was doing there, but defendant did not respond. Instead, defendant advanced toward her, grabbed her wrists and her face, and pushed her against the basement door. He said, "Help me. I just got fucked." Megan testified she was

-2-

scared and was yelling for her mother. Defendant then grabbed the back of her hair and, with her hair wrapped around his hand, he began to pull her toward the back door. As defendant pulled her toward the door, Megan continued to scream for her mother. When they reached the doorway, Megan held onto the doorknob in an attempt to keep defendant from dragging her outside. Defendant took off running when Megan's mother appeared in the kitchen.

Megan testified that she sustained various physical injuries in the course of the assault. She said defendant hurt her when he pulled her by the hair. Afterward, she had "really big bumps" on the back of her head, which "just kept *** throbbing." Her shoulder was also injured in the course of the struggle. Megan described it as "really bruised." Her little finger was jammed and "felt like it was broken." In addition to her physical injuries, Megan testified that she does not sleep much since the incident and feels uneasy in her own home. She said she is afraid to go into the kitchen by herself when it is dark. She thinks about that night and is still bothered by it.

Megan identified the defendant at trial. She testified she did not give defendant permission to come into her home, and he did not leave when she encountered him. To the contrary, he assaulted her.

Megan's mother, Theresa Clowers, testified that she, her husband, and her 16-year-old daughter, Megan Walker, lived at 913 Chestnut Street in Quincy, Illinois, in April of 2005. In the early morning hours of April 26, 2005, Clowers heard a "rukus" in her kitchen followed by "a scream of terror" from Megan. Clowers ran to the kitchen and found the back door standing open and Megan holding her head and crying. Clowers called 911, reporting that someone had broken into her house and had assaulted her daughter.

After the police arrived, and she and Megan had spoken with responding officers, Clowers took Megan to the emergency room. Although she was eventually released to go home, Megan was very upset and wanted Clowers to hold her while they were at the hospital. Megan cried the rest of the morning. At the time of the assault, Clowers noticed that Megan's face and cheeks were "red like *** fingers had been squeezing her." Megan's right shoulder was red and the little finger on her right hand was swollen.

Clowers testified that, at the time of trial, three months after the assault, Megan still was not sleeping much. According to Clowers, at times, for "three or four days she won't sleep at all." Clowers stated that Megan was not like that before the assault. After the assault, Megan was afraid to go into, or stay in, the kitchen by herself. She now tends to isolate herself in her bedroom. As of the time of trial, Megan was not eating well, she seemed sad, and was "teary-eyed a lot." Again, that was not indicative of her behavior before she was assaulted.

Clowers testified that she never gave permission to defendant to enter her home. She stated, at the time of the incident, she had a large doghouse outside her backdoor, a doghouse large enough that "two adult people can get in it."

Quincy police officers, who responded to Walker's residence, testified at trial, substantially corroborating the testimony of Megan and her mother. Officers found defendant behind the house next door to the Clowers residence. Defendant was wearing a blue shirt, but was not wearing pants.

One officer, who observed Megan immediately after the assault, testified that she was crying and "extremely upset" when he arrived on the scene. It was "several minutes" before she was able to carry on a conversation. He observed some redness on Megan's arm, and he noted that she complained of a finger injury. He accompanied Megan to the hospital, where he learned that she had a large abrasion on her shoulder.

Another officer searched the doghouse located in the backyard of the Clowers residence. In that doghouse, he found a pair of jeans, boots, and a hat. In the jeans, he found a wallet containing defendant's Arizona driver's license.

The arresting officer interviewed defendant around 2 a.m. on April 26, 2005. The officer smelled the odor of alcohol emanating from defendant; however, he noted that defendant was cooperative and responsive, and he did not appear to be confused. Because defendant appeared to be intoxicated, officers administered a portable breath test, the result of which was a reading of 0.19.

In the course of the interview, defendant told the officer he was a truck driver from Arizona. While traveling from Ohio to Arizona,

defendant said he "got dumped off in St. Louis." He said he hitched a ride to Quincy and had been drinking at a Quincy tavern on the night of the incident. He left the tavern with a man who was supposed to give him a ride to a hotel and "hook him up with a female [who] would eventually perform oral sex on him." According to defendant, he later got out of the man's car and into another car occupied by a woman. He said she helped him take his pants and boots off; however, he could not remember exactly what happened after that.

Defendant said he *did* recall walking into the residence at 913 Chestnut and being startled when a young female turned on the light. He conceded that he did not have permission to enter the residence; however, he said he thought he was entering his apartment in Arizona. Defendant admitted that the young girl asked him several times what he was doing there and told him to get out of the house. He acknowledged that he responded by walking toward her, grabbing her by the shoulder and/or the hair, and attempting to drag her out of the residence as she was screaming. Defendant offered no explanation for his actions. He did not tell the girl that he had been robbed, nor did he ask her to call the police.

Yet another officer testified to a subsequent statement defendant gave to police. In that version of events, defendant said he left a local bar with a man who was supposed to find him a place to stay. They ended up at a house near the Clowers residence. Defendant said he purchased crack cocaine while at that location, and the individuals with whom he was associating subsequently offered to "set him up" with a girl who would perform oral sex on him. To that end, he walked to the back of the residence where he was supposed to meet a black female. Defendant said the next thing he knew he was stripped of his pants, his money was taken from him, and the girl took off running. Defendant stated he ended up in the residence at 913 Chestnut because that was where he thought the girl had gone. He admitted, when he saw Megan Walker, a white female, he knew she was not the girl he was pursuing. He claimed he only touched Megan to calm her down. Defendant said he left on his own after Megan started screaming. He said he felt someone had set him up, but he acknowledged that he knew Megan was not involved in that plan as soon as he encountered her.

Defendant's testimony was similar in some respects to the statements he gave to police, but there were significant differences as well, particularly between defendant's initial statement and his trial testimony.

At trial, defendant testified that the girl who was supposed to perform oral sex on him had taken him from a nearby house to what he thought at the time was a shed, but turned out to be the doghouse in back of the residence at 913 Chestnut. Defendant stated this "black female" helped him remove his pants and boots, and when she got his pants off, she reached into his pocket, grabbed his cash, and ran. He said he began chasing her and then heard a door slam "right in front of" him. Defendant testified that he "ran in right behind her inside the house." He said it was "pitch black" inside, but a light came on "immediately" as he entered the house. Defendant testified he then saw Megan Walker "coming at me as I was going at her." He then testified as to his version of subsequent events:

> "I put my hand up to stop us from colliding and put it on her shoulder and *** as I put my hand on her shoulder her hair was strung down over her shoulder so my hand went onto her hair and shoulder and I told her I said, 'I just got, I just got fucked. Where's this girl that just came in ahead of me?' And she was screaming so loud and not listening to me that I just pulled my hand off and turned around, ran and I believe my hand got caught in her hair."

Defendant said he left the house immediately. He denied any intent to harm Megan Walker.

Under cross-examination, defendant took issue with the prosecutor's assertion–derived from testimony regarding defendant's first statement to authorities–that he was "so messed up" when he entered the Walker residence that he thought he was going into his own residence in Arizona. Defendant stated: "I did not say that. *** I am claiming that they misunderstood what I said." Defendant also denied that he ever told police he had tried to drag Megan from her residence.

Following closing arguments, the jury was instructed in the applicable law. Pertinent to issues raised in this appeal, the jury was instructed as follows, without objection from defense counsel:

"A person commits the offense of home invasion when he, not being a police officer acting in the line of duty, without authority, knowingly enters the dwelling place of another and remains in such dwelling until when [*sic*] he knows or has reason to know that one or more persons is present, and intentionally causes any injury to any person within the dwelling place." See Illinois Pattern Jury Instructions, Criminal, No. 11.53 (4th ed. 2000) (hereinafter IPI Criminal 4th).

"The term 'injury' in the definition of home invasion may include physical injury. It also includes psychological or emotional trauma if that trauma was the result of some physical contact." See IPI Criminal 4th No. 11.53B.

The jury found the defendant guilty of home invasion, but was unable to reach a verdict on attempt (kidnapping). The court subsequently sentenced defendant to 20 years' imprisonment.

Thereafter, defendant filed a *pro se* motion for reduction of sentence and a *pro se* document alleging numerous instances of ineffective assistance of counsel. Among defendant's allegations was a complaint that counsel: "Did not object to alleged emotional injury to victim when there was no psycological [*sic*] evidence by a proffessional [*sic*] or expert witness." Defense counsel filed a motion to reconsider sentence on behalf of defendant and a motion for new trial as well. In the latter motion, counsel argued only that the State failed to prove defendant guilty of home invasion beyond a reasonable doubt. On February 24, 2006, the circuit court conducted a hearing on defendant's posttrial motions, ultimately denying defendant's motion for new trial and his motions pertaining to sentence. Although the court initially agreed with the State's assertion that defendant's *pro se* allegations of ineffective assistance of counsel could be addressed "at a different time and different forum," the court concluded the hearing by making mention of those allegations nonetheless, stating that the court "did not take those allegations lightly," and "did look at them in substantial detail." With respect to those allegations, the court noted they were either "conclusory with no evidence as to *** relevancy," they were "speculative," they were "not supported by the evidence," and "even if true or relevant, the reasonable probability of the outcome of the trial being different was basically nil."

## ANALYSIS

Defendant first argues that the trial court erred in allowing the prosecution to present evidence of psychological trauma and instructing the jury that evidence of psychological trauma could satisfy the injury element of the offense of home invasion. We note, initially, that defendant did not object to the introduction of evidence of psychological harm at trial. Moreover, he did not object to the correlative instruction, he offered no alternative instruction, and he did not raise the instructional issue in a posttrial motion.

The failure to object to allegedly improper evidence when it is introduced at trial results in forfeiture of the issue for purposes of appeal. See *People v. Ramsey*, 205 Ill. 2d 287, 293 (2002); *People v. Nieves*, 192 Ill. 2d 487, 502 (2000). Furthermore, a defendant generally forfeits review of any *instructional* issue if he does not object to the instruction or offer an alternative at trial, and he does not raise the issue in a posttrial motion. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). "This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors before the instructions are given, and consequently precluding a defendant from obtaining a reversal through inaction." *Piatkowski*, 225 Ill. 2d at 564.

Acknowledging the procedural default, defendant argues that this court should consider his allegations of error under our plain-error rule. Our plain-error rule is set forth in Supreme Court Rule 615(a), which states as follows:

> "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a).

This court construes, "identically," Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), enunciating general principles of plain-error review, and Supreme Court Supreme Court Rule 451(c) (177 Ill. 2d R. 451(c)), which specifically addresses review of alleged instructional error. *Piatkowski*, 225 Ill. 2d at 564; *People v. Durr*, 215 Ill. 2d 283, 296 (2005). Our prior decisions make clear that this court may invoke the plain-error rule to review alleged errors not properly preserved

when (1) the evidence in a criminal case is closely balanced, or (2) the error is so fundamental, and of such magnitude, that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003).

In addressing a defendant's plain-error argument, we first consider whether error occurred at all. *People v. Urdiales*, 225 Ill. 2d 354, 415 (2007). In order " '[t]o determine whether a purported error is "plain" requires a substantive look at it.' " *Johnson*, 208 Ill. 2d at 64, quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995). Thus, we first consider whether the introduction of evidence of psychological harm at trial, and the utilization of IPI Criminal 4th No. 11.53B when instructing the jury, were errors.

We begin our analysis with the language of the statute in question, which is the surest and most reliable indicator of the legislature's intent. See *In re Jaime P.*, 223 Ill. 2d 526, 532 (2006). The statute defining the offense of home invasion provides in part:

> "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present and
>
> > (1) While armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs, or
> >
> > (2) Intentionally causes any injury, except as provided in subsection (a)(5), to any person or persons within such dwelling place, or
> >
> > (3) While armed with a firearm uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs, or

(4) Uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs and during the commission of the offense personally discharges a firearm, or

(5) Personally discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person within such dwelling place[.]" 720 ILCS 5/12–11(a)(1) through (a)(5) (West 2004).

Defendant, who was charged under subsection (a)(2) of the home invasion statute, argues that the phrase "any injury," as used in that subsection, does not include psychological injury or trauma. He contends his position is "bolstered by the fact that the offense of home invasion is contained in that portion of the Illinois Criminal Code entitled 'Bodily Harm.' " He also cites the isolated comments of four legislators–comments regarding an offense that can be committed in at least five different ways, as the quoted portions of the statute indicate–to support his contention that "any injury" must be construed as "bodily injury."

As a preliminary matter, we note the pitfalls of relying upon such "snippet[s] of legislative history." See *People v. Falbe*, 189 Ill. 2d 635, 646-47 (2000). In *Falbe*, a case in which the comments of four state representatives were offered to establish the purpose of legislation, this court noted: "Defendants do not offer us any insight into the thoughts of the 114 remaining representatives, or the 59 members of the senate, all of whom had a vote to cast when this legislation was passed and enacted into law." *Falbe*, 189 Ill. 2d at 647. We believe that observation applies in this instance as well, particularly where the statute under discussion provides for so many different modes of commission.

Beyond that observation, we reject the defendant's argument on the merits. The internal language of the home invasion statute itself indicates that legislators were familiar with the word "bodily," as they use that word in subsection (a)(5) of the *same statute*, referring to "bodily harm." "Harm" is a synonym of "injury." As defined by Webster's, "harm" means "physical or mental damage: INJURY." Webster's Third New International Dictionary 1034 (1976). "Injury" means "an act that damages, harms, or hurts: an unjust or undeserved

infliction of suffering or harm." Webster's Third New International Dictionary 1164 (1976). If, as defendant suggests, the legislators intended to limit the otherwise expansive phrase "any injury," they could have simply used the phrase "bodily injury" or "bodily harm," as they did in subsection (a)(5) of section 12–11, and as they have done in myriad other instances throughout the Criminal Code. When the legislature uses certain language in one part of a statute and different language in another, we may assume different meanings were intended. *Carver v. Bond/Fayette/Effingham Regional Board of School Trustees*, 146 Ill. 2d 347, 353 (1992). We assume there was significance to the use of the broader term "*any* injury." Use of the more inclusive term in this context could only mean that the phrase refers to both physical *and* psychological injury or harm.

As some commentators have noted, it is common for the law to recognize that some crimes–such as those involving an intrusion into the victim's living quarters–cause *psychological* as well as physical harm. "Hence, many crimes associated with a high degree of psychological harm, such as *** residential burglary ***, are graded and punished more sternly than other crimes that can inflict comparable physical or pecuniary injuries, such as *** commercial burglary ***." R. Mikos, *"Eggshell" Victims, Private Precautions, and the Societal Benefits of Shifting Crime*, 105 Mich. L. Rev. 307, 335 (2006). Federal sentencing guidelines take into account increased risks for both physical *and psychological* injury when a residence is the target of a burglary, increasing the base offense level for residential burglary over other forms of burglary. See 18 U.S.C.A. §2B2.1, Commentary (West 2007). Indeed, it seems to us little more than a matter of common sense that a perpetrator's violation of the sanctity of one's living space, with the intent to cause injury, carries with it the potential for psychological injury or trauma. The legislature's use of the broad term "any injury" in subsection (a)(2) of the home invasion statute appears to recognize that potential.

The fact that the home invasion statute is contained in that portion of the Criminal Code entitled "Bodily Harm" does not persuade us that the phraseology chosen by the legislature should be interpreted restrictively, as defendant suggests. As the State points out, other crimes falling under the heading of "Bodily Harm" similarly concern themselves with the psychological response of the victim. See, *e.g.*,

-11-

720 ILCS 5/12–1 (West 2004) (the crime of assault occurs when "[a] person *** places another in reasonable apprehension of receiving a battery"); 720 ILCS 5/12–6(a) (West 2004) (the crime of intimidation is committed by "communicat[ing] to another *** a threat to perform" certain acts); 720 ILCS 5/12–7.3(a)(2) (West 2004) (crime of "stalking" is complete when the perpetrator "places [a person being followed] in reasonable apprehension of immediate or future bodily harm"). As the State concludes, "[t]he fact that these other crimes can be committed in the absence of physical injury, or in many cases even physical *contact*, defeats defendant's *** argument that the heading 'bodily harm' means the offenses described therein are concerned only with physical injury."

We conclude neither placement of the home invasion statute under a broad statutory heading, nor the language of the pertinent subsection of the statute, dictate the restricted construction that the defendant would have us impose. To the contrary, use of the phrase "any injury" clearly suggests an application beyond mere *bodily* injury. Thus, we hold that proof of *psychological* injury or trauma satisfies the injury element of section 12–11(a)(2) of the Criminal Code. Consequently, we find that the trial court did not err when it allowed evidence of psychological harm and it instructed the jury with IPI Criminal 4th No. 11.53B.

We now turn to defendant's second argument, *i.e.*, that expert testimony is necessary to prove psychological harm and, because there was no such testimony in this case, the evidence was insufficient to convict defendant. We note, initially, that defendant cites no cases–from this jurisdiction or any other–holding that expert testimony is necessary to prove psychological harm. Moreover, we take note of the following statement in defendant's reply brief: "Because of the uncontradicted evidence about Ms. Walker's emotional status following her encounter with Mr. Hudson the jury could have easily found that Ms. Walker suffered psychological harm and concluded that it did not have to determine whether Mr. Hudson intentionally caused physical harm to Ms. Walker." Indeed, the jury could have easily concluded that Megan Walker suffered psychological harm.

There was uncontradicted testimony from Megan and her mother evincing a marked change in Megan's behavior and emotional status after she was assaulted by defendant. After she was assaulted, Megan

-12-

suffered from sleep deprivation, she tended to isolate herself from the rest of her family, she was afraid to go into or stay in her own kitchen, she was not eating well, and she continued to be very emotional or "teary-eyed." Megan's mother testified that those problems did not exist prior to the night of the home invasion, *i.e.*, the night that defendant rushed into Megan's home, grabbed her, and allegedly tried to drag her from her residence. We find the circumstances of the offense were such that a victim, such as Megan, certainly could suffer psychological trauma, and the uncontradicted evidence indicates that she did.

It is *uncontested* that defendant, a stranger who was naked from the waist down, entered the victim's residence without authority, late at night, and advanced toward a startled, distraught and screaming 16-year-old girl, grabbing hold of her. The parties may differ as to whether defendant intended to hurt Megan, or drag her out of the house, but that much is undisputed. Under the circumstances of this case, we do not believe expert testimony was necessary to establish that the 16-year-old female victim suffered psychological trauma.

Although the defendant has not supplied relevant authority on this point, our own research has revealed pertinent decisions, in analogous contexts, from other jurisdictions that support our conclusion that expert testimony is not always necessary to establish psychological trauma.

For example, in *Brooks v. State*, 487 So. 2d 68, 69-70 (Fla. App. 1986), the appellate court found lay testimony sufficient proof of psychological harm to justify a departure from recommended sentencing guidelines where defendant's "presence within the respective dwelling was discovered by the occupants–thereby inflicting psychological harm to them." The appellate court rejected defendant's contention that the record did not support a finding that the victims suffered "great psychological harm," stating:

> "On two occasions, Brooks was observed fleeing from the dwelling by the occupants, and in one case the sixteen year old daughter of the household awakened and observed Brooks sitting on the floor of her room rifling her purse. Although there was no victim injury or threat of injury in any of the incidents, the victims expressed surprise and a lasting sense of distress and fear due to Brooks's intrusion. We conclude that

-13-

this particular form of psychological trauma constitutes a valid basis for departure [from sentencing guidelines] ***." *Brooks*, 487 So. 2d at 70.

Although another appellate court panel, citing an intervening decision by the Florida Supreme Court, has questioned *Brooks*'s sanctioning of the use of psychological trauma as a valid basis for departure from Florida sentencing guidelines, absent extraordinary circumstances or discernible physical manifestation resulting from the trauma (see *Carter v. State*, 516 So. 2d 1142, 1143 (Fla. App. 1987), citing *State v. Rousseau*, 509 So. 2d 281 (Fla. 1987)), *Brooks* still stands for the proposition that lay testimony may suffice to establish "great psychological harm" in a sentencing proceeding. We recognize that the standard of proof at the *guilt* phase of a criminal proceeding is proof beyond a reasonable doubt, and the standard applicable to sentencing at the time of the *Brooks* decision may have been something less; however, we also note that the issue in *Brooks* was whether the evidence established *great* psychological harm–a requirement beyond mere psychological injury–and the circumstances giving rise to a finding of great psychological harm were something less than what we have here. Notably, the 16-year-old girl in *Brooks* was not involved in a physical confrontation with a half-naked man who tried to drag her out of her home.

In other contexts, where proof of psychological injury or harm is at issue, courts have held that expert testimony is not an absolute requirement. Recently, in *Austin v. Sneed*, No. M2006–00083–COA–R3–CV, slip op. at 11 (Tenn. Ct. App. November 13, 2007), a Tennessee appellate court noted: "In excessive force cases, expert medical testimony is not necessary when the cause of a physical or psychological injury is within the common knowledge of lay persons." In the context of a workers' compensation case, an Alabama appellate court, quoting a regional treatise on the subject, stated as follows:

> "In appropriate circumstances, an award may be made for mental disability even though medical testimony relating to its existence or cause is inconclusive, or even nonexistent. For example, in *Federal Mogul Corp. v. Campbell*, [494 So. 2d 443 (Ala. Civ. App. 1986),] the court held that the existence of a mental disability and its causal link to the employee's

-14-

occupation may be established in the absence of clear expert opinions by lay testimony showing that the employee behaved normally and could perform his job before the accident and exhibited bizarre emotional behavior immediately afterwards that interfered with or precluded him from being able to work." *USX Corp. v. Bradley*, 881 So. 2d 421, 430 (Ala. App. 2003), quoting 1 T. Moore, Alabama Workers' Compensation §6:15, at 180-81 (1998).

Similarly, in *Uebelacker v. Cincom Systems, Inc.*, 48 Ohio App. 3d 268, 549 N.E.2d 1210 (1988), a case involving an action for false imprisonment, defamation, and intentional infliction of emotional distress, an Ohio appellate court addressed the sufficiency of lay testimony in proving "psychic injury" in *that* context:

> "In *Paugh v. Hanks*, \*\*\* the Supreme Court of Ohio recognized an action for negligent infliction of serious emotional distress and established standards for proving the 'seriousness' of a psychic injury. The court in *Yeager*, \*\*\* in setting the standards for a claim for intentional infliction of emotional distress, recognized the similarities between the two actions and adopted the standard established in *Paugh* for proving the seriousness of an intentional injury. [Citation.] Thus, an action to recover for emotional distress may not be premised upon mere embarrassment or hurt feelings, but must be predicated upon a psychic injury that is both severe and debilitating. [Citation.] Proof of serious emotional distress may be offered in the form of expert medical testimony, but expert opinion is not indispensable. Lay witnesses acquainted with the plaintiff may also testify to significant changes that they have observed in the emotional or habitual makeup of the plaintiff." *Uebelacker*, 48 Ohio App. 3d at 276, 549 N.E.2d at 1220.

See also *Powell v. Grant Medical Center*, 148 Ohio App. 3d 1, 6, 771 N.E.2d 874, 878 (2002) (expert medical testimony is not indispensable to a claim of serious emotional distress).

In this case, jurors could reasonably find, without the assistance of expert testimony, that the circumstances of the offense were such as to cause psychological injury to a 16-year-old girl. Moreover, the testimony of the victim and her mother described symptoms and

changed behavior following the offense, indicating that the victim *had* suffered psychological trauma. Although expert testimony may be required in some cases to prove psychological injury, we find it was not necessary given the facts of *this* case. Therefore, we find no error in convicting defendant based on lay testimony alone.

In sum, we reject the defendant's contention that the trial court erred in allowing the prosecution to present evidence of psychological trauma and instructing the jury that evidence of psychological trauma could satisfy the injury element of the offense of home invasion. We also reject defendant's claim that the State's evidence was insufficient to prove psychological harm because no expert testimony was presented. There is no error here; therefore, there can be no plain error. Consequently, we affirm the judgment of the appellate court as to the issues presented in this appeal. Pursuant to the appellate court's directive, the matter will be remanded to the circuit court for proceedings consistent with the appellate court's order.

*Affirmed.*