NOTICE

Decision filed 10/15/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190071-U

NO. 5-19-0071

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Franklin County. |
| | ) | |
| v. | ) | No. 17-CF-71 |
| | ) | |
| CHARLES E. HUTSON, | ) | Honorable |
| | ) | Thomas J. Dinn III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for sexual exploitation of a child where the trial court did not commit plain error in admitting the victim's out-of-court statements into evidence, and where defense counsel was not ineffective for failing to object to the admission of the victim's out-of-court statements at trial.

¶ 2    Following a bench trial, defendant, Charles E. Hutson, was convicted in the circuit court of Franklin County of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and one count of sexual exploitation of a child (*id*. § 11-9.1(a)(2)). Defendant was sentenced to life imprisonment on the two counts of predatory criminal sexual assault of a child and three years' imprisonment on the count of sexual exploitation of a child. Defendant appeals his conviction for sexual exploitation of

1

a child, arguing that his sixth amendment right to confront witnesses was violated when certain portions of the victim's out-of-court statements were admitted into evidence at trial. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4      On February 10, 2017, defendant was charged by information with two counts (counts I and II) of predatory criminal sexual assault of a child in violation of section 11-1.40(a)(1) of the Criminal Code of 2012 (Criminal Code) (*id*. § 11-1.40(a)(1)), Class X felonies, and one count (count III) of sexual exploitation of a child in violation of section 11-9.1(a)(2) of the Criminal Code (*id*. § 11-9.1(a)(2)), a Class 4 felony. In support of counts I and II, the State alleged, *inter alia*, that defendant, who was over the age of 17, knowingly committed acts of sexual conduct with N.B. and A.G., who were both children under the age of 13. In support of count III, the State alleged, *inter alia*, that defendant exposed his penis to N.B. between the dates of February 2, 2017, and February 4, 2017. Because defendant had attained the age of 18 and the offenses alleged in counts I and II involved two separate victims, the State sought a sentence of natural life imprisonment as permitted by section 11-1.40(b)(1.2) of the Criminal Code (*id*. § 11-1.40(b)(1.2)). A grand jury subsequently returned an indictment charging defendant with the same offenses charged in the information.

¶ 5                              A. Section 115-10 Motion

¶ 6      In March 2017, the State filed a motion pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/115-10 (West 2016)), seeking to admit certain out-of-court statements made by N.B. and A.G. at trial.

2

Specifically, the State sought to admit the recorded statements N.B. and A.G. made during their interviews at the child advocacy center (CAC) in Herrin, Illinois, and the statements N.B. and A.G. made to Kelli Williams, who was N.B.'s biological mother and A.G.'s stepmother. The State subsequently amended the motion to seek admission of additional statements N.B. and A.G. made to Robert Williams, who was N.B.'s stepfather and A.G.'s biological father.

¶ 7    On April 11, 2017, the trial court held a hearing on the State's amended motion. The State first called Leah Brown, who conducted N.B. and A.G.'s interviews at the CAC, to testify to the following details. Brown was the executive director at the Franklin-Williamson CAC and also an experienced forensic interviewer. She conducted video-recorded interviews with N.B. and A.G., at the request of the West Frankfort Police Department, on February 7, 2017. Brown identified DVD copies of the interviews, the documents she used during the interviews, and the documents she prepared following the interviews. The DVDs and documentation were admitted into evidence at the hearing without objection. The court indicated that it would view the DVDs at a later time.

¶ 8    Next, the State called Kelli, who testified as follows. From December 2016 to February 2017, Kelli lived with N.B., A.G., and her husband, Robert, at defendant's house in West Frankfort, Illinois. At the time the family started living at defendant's house, defendant was in the Franklin County jail. Following his release, however, he moved in with the family. Shortly thereafter, N.B. approached Kelli and stated, "Mommy, Uncle Bubby told me I could touch his boy parts if I wanted to." Kelli asked N.B. if she knew the difference between the truth and a lie, and N.B. stated that "it really

3

did happen." Kelli then called Robert into the room and informed him of the incident. During their discussion, A.G. came into the room and advised that defendant had reached his hands down her pants and attempted to touch "her privates," which A.G. referred to as her "cookies." Following their discussion, Kelli took N.B. and A.G. to stay at their "Nana's house" in West Frankfort. Kelli explained that the children referred to her mother, Debra Gaskin, as Nana.

¶ 9    Kelli testified that N.B. and A.G. provided additional details the following day. Specifically, N.B. indicated that the incident had happened on February 3, 2017. Kelli explained that defendant had agreed to babysit N.B. that day because N.B. had a fever. Kelli also learned from N.B. that defendant "sat her down at the computer and he was playing adult movies for her." When Kelli asked N.B. to describe the movie, N.B. stated that the movie depicted "a woman sucking on a boy part." N.B. then told Kelli that defendant "exposed his penis to her and told her that she could touch it if she wanted to, and she told him no." N.B. also told Kelli that defendant "tried to put his hands down her pants." Specific to A.G., Kelli indicated that, on February 2, 2017, A.G. stated defendant "kept trying to put his hands down her pants and was touching bare skin." A.G. also stated that defendant "tried to put a finger in her, and she jerked away from him." After learning the additional details from N.B. and A.G., Kelli went straight to the police station to make a report. A detective later contacted her and arranged an appointment at the CAC on February 7, 2017.

¶ 10    On cross-examination, Kelli agreed that N.B. never stated that defendant had penetrated her with his finger. According to Kelli, N.B. stated that defendant had

4

attempted to put his hands down N.B.'s pants while playing adult movies, but N.B. told him no multiple times. Kelli, again, reiterated that defendant exposed his penis to N.B. and told N.B. she could touch it if she wanted to.

¶ 11    The State then called Robert, who testified as follows. Robert initially admitted that he had multiple prior felony and misdemeanor convictions. Robert lived with Kelli, A.G., and N.B. at defendant's house in West Frankfort. Robert clarified that A.G. and N.B. referred to defendant as "Uncle Bubby." One night, Kelli called Robert into the bedroom and N.B. told him that defendant had "exposed himself to her and had her watching adult movies on his computer." Ten minutes later, A.G. came into the room and told Robert that defendant "had tried to touch her down there in her private areas." Shortly thereafter, Kelli took the children to Nana's house.

¶ 12    Following witness testimony, the parties presented closing arguments. The State asserted that N.B. and A.G. would likely testify at trial, "which [was] one of the elements of the statute." The State also asserted that the time, nature, and circumstances of the out-of-court statements N.B. and A.G. made during the CAC interview and to Kelli and Robert were of such nature that they were reliable and, thus, should be admitted into evidence under the hearsay exception set forth "in 110-2 of the Illinois Code of Criminal Procedure." The State, acknowledging that the trial court had not yet viewed the DVDs, maintained that the CAC interview included various statements made by the children that supported the charges against defendant. The State specifically referenced a statement that defendant had placed his finger in one victim's vagina and a statement that defendant had exposed his penis to one of the victims. Thus, the State requested that the court admit

5

all of the out-of-court statements at trial. In response, defense counsel argued that, in the event the children did not testify at trial, there was insufficient evidence corroborating the out-of-court statements.

¶ 13    Following closing arguments, the trial court stated that it would review the DVD recordings of the CAC interviews and issue a ruling regarding those statements at a later date. The court issued a provisional ruling that the out-of-court statements N.B. and A.G. made to Robert and Kelli could be admitted into evidence at trial. In doing so, the court found that the charges against defendant met "the hearsay exception under 115-10." The court also found that the time, content, and circumstances of the out-of-court-statements N.B. and A.G. made to Kelli and Robert provided sufficient safeguards of reliability. While the court found the out-of-court statements satisfied the reliability requirement of the statute, the court noted that it would have to revisit the second requirement of the statute—that the child either testify or, if the child is unavailable as a witness, there is sufficient corroborating evidence—at trial. After reviewing the DVDs, the court later ruled that the out-of-court statements made by N.B. and A.G. during the CAC interviews could also be admitted into evidence at trial.

¶ 14                              B. Bench Trial

¶ 15    On March 22, 2018, after defendant waived his right to a jury trial, the case proceeded to a two-day bench trial. The following factual recitation is taken from the evidence adduced at trial and has been limited to the facts relevant to this appeal.

¶ 16    The State first called N.B., who was offered as a competent child witness without objection and testified to the following details. At the time of trial, N.B. was eight years

6

old and lived in West Frankfort. N.B. recalled that she had previously lived with her "Nana" in West Frankfort and that she had moved in with her Nana for a specific reason. However, when asked if she could explain why she had moved in with her Nana, N.B. responded, "No." The State then asked if N.B. remembered talking to "some people" at the CAC where they "took a movie" of her and if she remembered watching that movie, and N.B. responded, "Yeah." N.B. specifically recalled "talking to people about what took place."

¶ 17   The State next asked N.B. if she had had lived at "somebody else's house" prior to living at her Nana's house, and she responded, "Right." When asked if that person was in the courtroom, N.B. moved her head up and down but did not provide an audible response. When asked if she moved out of that house and into her Nana's house because something had happened to her, N.B. responded, "Yes." N.B. also responded, "Yes," when asked if someone had touched her "in a bad spot." When the State asked N.B. to point to the spot where she had been touched, N.B. complied and pointed to an area below her waist. N.B. agreed that she had used a specific term during her CAC interview when referring to the spot below her waist. However, when the State asked what she had called the spot during the interview and told her she could "say it," N.B. responded, "No."

¶ 18   The State then questioned N.B. about the house she had lived in prior to moving in with her Nana. She recalled living at the house and testified that she had lived there with A.G., Kelli, and Robert. When asked if they all left the house and went to her Nana's, N.B. responded, "Yes." The following colloquy then took place:

7

"Q. And between that—after that—did you tell your mom something bad happened to you in that house?

A. (Witness moves head up and down.)

Q. Is that a 'yes'?

[THE STATE]: I'd like the record to reflect the witness is nodding her head.

[THE STATE]: You need to answer—you need to tell me—if you need to nod your head like that, that's fine. Is that what happened?

A. (Witness moves head up and down.)

THE COURT: The record will reflect."

¶ 19 The State then asked if N.B. had an uncle that she called "Uncle Buddy" prior to moving into her Nana's house, and N.B. indicated that the correct name was "Bubby" not "Buddy." The State then showed N.B. a photograph of defendant (People's Exhibit 1) and asked if she could identify the person in the photograph. N.B. responded, "Bubby." When the State asked her to confirm that the person in the photograph was "Bubby," N.B. moved her head up and down. When asked if she could say "yes," N.B. responded, "Yes."

¶ 20 The State next questioned N.B. about the computer at defendant's house. Specifically, the following exchange took place:

"Q. All right. Now, in this house you went to before you went to Nana's house, Uncle Bubby had a computer, didn't he?

A. (Witness moves head up and down.)

Q. You're nodding your head 'yes'? Yes?

A. (Witness moves head up and down.)

Q. Okay. And did you see some adult kind of stuff on that computer?

A. (Witness moves head up and down.)

[THE STATE]: Let the record reflect the witness is nodding her head 'yes.'

THE COURT: It will.

[THE STATE]: And you told your mom about that stuff, didn't you?

A. (Witness moves head up and down.)

Q. Yes?

A. (Witness moves head up and down.)

THE COURT: Once again, nodding.

8

[THE STATE]: And you also told the people of the [CAC] about that that taped you?

A. Yes.

Q. All right. Thank you.

Bubby also told you things about—when you were in that house before you went to Nana's about letting him—you seeing his private part, didn't he?

A. (Witness moves head up and down.)

Q. Yes? You're nodding your head. Would you nod your head in a big way if that is true?

A. (Witness moves head up and down.)

[THE STATE]: Let the record reflect the witness is nodding her head.

THE COURT: It will so reflect.

[THE STATE]: And you told your mom about that, too?

A. (Witness moves head up and down.)

THE COURT: Once again, nodding."

The State then asked N.B. if Uncle Bubby went by another name sometimes, and N.B. responded, "Yes." When asked what the other name was, N.B. stated that she did not "want to tell it." N.B. agreed, however, that he was in the courtroom with her.

¶ 21 Defense counsel then briefly questioned N.B. on cross-examination. Specifically, the following exchange took place:

"Q. I have got some questions for you, too. You mentioned that your uncle showed you some videos that you didn't like that were adult videos?

A. Yes.

Q. The video that he showed you on the computer, do you remember that?

A. Yeah.

Q. Do you remember, did the people in that video have white skin?

A. Yes.

Q. They did?

A. Yes.

Q. Okay. Also, you have talked a lot about what happened. Was that the only thing that you say you ever saw Uncle Bubby do?

A. No.

Q. Okay. Was there another time where you say something happened?

A. Yes.

Q. Can you talk about that?

A. No, not right now.

9

Q. Okay. And, [N.B.], I want to ask something that's very personal, and I'm sorry for that. You said that Uncle Bubby touched you?

A. (Witness moves head up and down.)

Q. Did Uncle Bubby, in your memory, put his fingers inside of you?

A. (Witness moves head up and down.)

[THE STATE]: Let the record reflect the witness is nodding her head 'yes.'

THE COURT: It will so reflect.

[DEFENSE COUNSEL]: [N.B.], I don't have any more questions for you. Thank you."

¶ 22 At the conclusion of N.B.'s testimony, the trial court stated, "I want to confirm that every instance in which [the State] indicated what the witness was doing physically and not audibly was correct, and the record should reflect that." When the court asked if defense counsel had a "quarrel with that," defense counsel responded, "I believe that was accurate, Your Honor."

¶ 23 Kelli testified to the following details on behalf of the State. Kelli lived with Robert, N.B., and A.G. at defendant's residence in February 2017. N.B. and A.G. went to live with their Nana "after everything happened with [defendant]." The family moved into defendant's residence in December 2016 after defendant, who was a blood relative to A.G. and Robert, had asked Robert to oversee his property while he was in jail. Kelli agreed that N.B. and A.G. referred to defendant as "Uncle Bubby." Shortly after defendant moved back into the residence, N.B. told Kelli that "something happened" between defendant and N.B. when he had babysat N.B. while she was sick. N.B. came to Kelli after defendant had watched her, and Kelli noticed that N.B. had "accidentally peed her pants," so she directed N.B. to take a shower. When N.B. got out of the shower, she stated, "Mommy, Uncle Bubby told me that I could touch his boy parts if I wanted to." Kelli responded by asking, "What?" N.B., again, stated that Uncle Bubby told her that

10

she could touch his boy parts if she wanted to. Kelli then advised N.B. that she could "mess [defendant's] life up" and inquired whether N.B. knew "the difference between the truth and a lie?" N.B. then stated that it was true and "really did happen."

¶ 24    Kelli testified that she immediately called Robert into the room to discuss the incident with N.B. During their discussion, A.G. informed Robert of an incident where defendant had tried to place his hands down A.G.'s pants. Kelli then left the residence with N.B. and A.G. and went to Nana's home. Kelli later learned from N.B. that defendant had let her watch an adult movie on his computer. Kelli denied that N.B. had ever seen an adult movie prior to residing with defendant. Kelli testified that she went to police the following morning and filed a report. The police then arranged for an interview with N.B. and A.G. at the CAC. Kelli advised N.B. and A.G. that they were going to the CAC to discuss the incident but denied telling them what to say at the CAC.

¶ 25    On cross-examination, Kelli agreed that N.B. did not state that defendant had penetrated her. N.B. had, instead, stated that defendant had tried to put his hands down N.B.'s pants, but she had run away from him. Kelli had taken N.B. and A.G. to a doctor, but the doctor found no signs of tearing, abrasion, or penetration. Kelli had informed police of the doctor's findings but did not inform the State.

¶ 26    Robert testified to the following details on behalf of the State. Robert, Kelli, N.B., and A.G. previously lived with defendant, who was Robert's uncle, in West Frankfort from December 2016 to February 2017. In February 2017, Kelli called Robert into the bedroom and informed him that defendant had tried to touch N.B. At the same time, A.G. informed Robert that defendant had tried to touch her as well. Robert decided to remove

11

the children from defendant's home and the family went to stay at their Nana's house. The following day, Kelli and Robert made a police report after getting the "full story" from N.B. and A.G. Specifically, Robert had learned from A.G. that defendant had tried to put his hands in A.G.'s pants and "insert his finger into her." Robert also learned from N.B. that defendant had "put on a porn video in his computer for her to watch and exposed himself to her and told her that she [could] touch his if she wanted to." After making the police report, Robert and Kelli took N.B. and A.G. to the CAC.

¶ 27 Robert admitted that he had multiple criminal convictions, including two felony domestic battery convictions, a felony unlawful restraint conviction, a misdemeanor domestic battery conviction, and a misdemeanor retail theft conviction. He was currently on probation but denied he was promised anything to testify at trial.

¶ 28 Brown then testified to the following details on behalf of the State. She recalled interviewing N.B. and A.G. at the CAC in Herrin, Illinois, on February 7, 2017, upon referral from police. Brown separately interviewed and video recorded each child alone. Brown identified a DVD copy of the recording of N.B.'s interview (People's Exhibit 4) and a DVD copy of the recording of A.G.'s interview (People's Exhibit 5). During Brown's testimony, both DVDs were admitted into evidence and played before the trial court without objection.

¶ 29 The DVD recording of N.B.'s CAC interview revealed the following details. N.B. stated that defendant put a "grown-up" movie on the computer, while another movie, titled "The Thompsons," was playing on the television. After defendant turned off "The Thompsons" he laid in bed with a button loose on his pajama bottoms and told N.B. that

12

she could touch "right here" on his "hoo-hah." N.B. stated that she could see defendant's "hoo-hah," which she identified as his private part. N.B. told Brown that she only saw defendant's "hoo-hah," not his "balls," and that defendant told N.B. that she could touch "it." N.B. was unable to describe what "it" looked like. N.B. also told Brown that defendant touched her "cookies," a term she used to describe her vagina, and that she asked him to stop "ten times," but he did not stop until her parents got home. N.B. stated that defendant's fingers moved inside of her and that she told her mother about the incident when she returned home. N.B. also claimed she told A.G. about what had happened with defendant.

¶ 30    Brown also testified that she took notes during each interview and prepared a forensic interview report setting forth her findings. Brown identified a copy of the report (People's Exhibit 6) she prepared after interviewing N.B., which was admitted into evidence without objection. Brown also identified the body chart diagrams she used while interviewing N.B. (People's Exhibits 8 and 9) and the drawings N.B. made during the interview (People's Exhibits 10 and 11), all of which were also admitted into evidence without objection.

¶ 31    After considering the evidence and the parties' closing arguments, the trial court entered an order finding defendant guilty on all counts. Defendant was subsequently sentenced to life imprisonment on counts I and II (predatory criminal sexual assault of a child) and three years' imprisonment for count III (sexual exploitation of a child). Defendant filed a timely notice of appeal.

¶ 32                                    II. Analysis

¶ 33    The primary issue defendant raises on appeal is whether his sixth amendment right to confront witnesses was violated when the trial court admitted certain portions of N.B.'s out-of-court statements (*i.e.*, the statements N.B. made during the videotaped CAC interview and the statements she made to Kelli and Robert) into evidence at trial pursuant to section 115-10 of the Code of Criminal Procedure (725 ILCS 5/115-10 (West 2016)). Defendant specifically argues that the admission of N.B.'s out-of-court statements, accusing defendant of exposing his penis to her,[1] violated both section 115-10 and his sixth amendment right to confront witnesses because N.B. did not adequately testify regarding defendant's exposure on direct examination and refused to answer defense counsel's questions regarding defendant's exposure on cross-examination. Defendant, thus, requests that this court reverse his conviction for sexual exploitation of a child[2] and remand for a new trial.

¶ 34    We initially note, as does the State, that defendant did not properly preserve this issue for appellate review. "To preserve an alleged error for review, a defendant must raise a timely objection at trial and raise the error in a written posttrial motion." *People v. Cosby*, 231 Ill. 2d 262, 271 (2008) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). "The failure to object to alleged error at trial and raise the issue in a posttrial motion ordinarily results in the forfeiture of the issue on appeal." *People v. Allen*, 222 Ill. 2d 340, 350 (2006) (citing *Enoch*, 122 Ill. 2d at 186-87). Here, defendant acknowledges that he

---

[1]Defendant's argument is limited to the portions of N.B.'s out-of-court statements where N.B. accused defendant of exposing his penis to her.

[2]Defendant does not challenge his convictions for predatory criminal sexual assault on appeal.

14

neither objected at trial nor included the issue in a written posttrial motion. Thus, we agree with the State that defendant has forfeited review of this issue on appeal.

¶ 35    Defendant requests that this court excuse his procedural forfeiture and review the issue under the first prong of the plain-error doctrine. The plain-error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (citing *People v. Averett*, 237 Ill. 2d 1, 18 (2010)). A reviewing court may apply the plain-error doctrine when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The burden of persuasion remains with the defendant under both prongs of the plain-error doctrine. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). If the defendant does not satisfy this burden, "the procedural default must be honored." *People v. Keene*, 169 Ill. 2d 1, 17 (1995). "The initial step in conducting plain-error analysis is to determine whether error occurred at all." *People v. Walker*, 232 Ill. 2d 113, 124 (2009) (citing *People v. Hudson*, 228 Ill. 2d 181, 191 (2008)). This requires a reviewing court "to conduct a substantive review of the issue." *Id.* at 125 (citing *People v. Johnson*, 208 Ill. 2d 53, 64 (2003)).

¶ 36    When evaluating the admission of out-of-court statements, reviewing courts conduct a two-step analysis to determine whether the statements satisfy both the

evidentiary and constitutional requirements. *In re E.H.*, 224 Ill. 2d 172, 179-80 (2006). The first step is determining whether the statement is admissible as an evidentiary matter. *Id.* at 179. "If the proponent seeks to admit the statement pursuant to section 115-10, the statement must be evaluated to see whether it meets that statute's requirements; if it is sought to be admitted pursuant to an exception to the hearsay rule, that claim must be evaluated." *Id.* Only after a reviewing court determines a statement is admissible as an evidentiary matter should the court consider constitutional claims. *Id.* at 179-80.

¶ 37 Accordingly, we begin by considering whether the trial court erred in admitting N.B.'s out-of-court statements pursuant to section 115-10. A trial court's ruling on the admissibility of evidence is generally reviewed for an abuse of discretion. *People v. Dabney*, 2017 IL App (3d) 140915, ¶ 17. Subsection (a) of section 115-10 provides, in pertinent part, that, in a prosecution for a sexual act perpetrated against a child under the age of 13, certain out-of-court statements made by the child victim shall be admitted as an exception to the hearsay rule. 725 ILCS 5/115-10(a) (West 2016). Subsection (b) of section 115-10 provides, however, that such evidence shall only be admitted if (1) the trial court conducts a hearing and determines that the time, content, and circumstances of the statement provide sufficient safeguards of reliability, and (2) the child either testifies at trial or is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement. *Id.* § 115-10(b)(2)(B).

¶ 38 After careful review, we conclude that the admission of N.B.'s out-of-court statements (*i.e.*, the statements N.B. made during the videotaped CAC interview and the statements she made to her parents), including those portions where N.B. accused

16

defendant of exposing his penis to her, complied with the requirements of section 115-10. It is undisputed that the State sought to introduce the out-of-court statements in a prosecution for a sexual act perpetrated against a child under the age of 13. Following a hearing, the trial court found, and defendant does not dispute, that N.B.'s out-of-court statements satisfied the reliability requirement set forth in the statute. The court also ruled that the statements would be admissible on the condition that N.B. testify at trial, as required by the statute. The record reveals, and defendant does not dispute, that N.B.'s out-of-court statements were admitted into evidence without objection after N.B. appeared and testified at trial.

¶ 39    Defendant concedes that N.B. adequately testified regarding defendant's alleged sexual assault, so as to satisfy the second statutory requirement. Defendant argues, however, that N.B. did not adequately testify regarding the incident where defendant exposed his penis to her, so as to satisfy the second statutory requirement. He, thus, asserts that those portions of N.B.'s out-of-court statements, where she accused defendant of exposing his penis to her, were improperly admitted pursuant to section 115-10.

¶ 40    In support of his argument, defendant cites both *People v. Armstrong*, 297 Ill. App. 3d 46 (1998), and *In re Rolandis G.*, 232 Ill. 2d 13 (2008), for the proposition that a child witness may become unavailable "mid-testimony" if the child is emotionally unable to continue testifying (*Armstrong*, 297 Ill. App. 3d at 48), or if the child refuses to respond to questions about the sexual conduct at issue at trial (*Rolandis G.*, 232 Ill. 2d at 18). We note, however, that in the instant case, unlike the children in *Armstrong* and *Rolandis G.*, N.B. did not become emotionally unable to testify at trial, nor did she refuse

to answer questions about defendant's sexual conduct. Moreover, we note that neither *Armstrong* nor *Rolandis G.* addressed the issue of whether the child's testimony satisfied the requirements of section 115-10. In *Armstrong*, the Second District briefly noted that the trial court properly found the child unavailable in considering, and rejecting, the defendant's argument that the State was required to produce corroborating evidence at the reliability hearing, rather than the trial, to satisfy the statutory requirements. 297 Ill. App. 3d at 48-49. In *Rolandis G.*, the State conceded on appeal that the child was unavailable to testify at trial. 232 Ill. 2d at 22. Thus, we find the present case readily distinguishable from *Armstrong* and *Rolandis G.*

¶ 41    Defendant also cites *People v. Learn*, 396 Ill. App. 3d 891, 899 (2009), for the proposition that "a witness's mere presence in court to answer general questions without testifying about the alleged offense is [in]sufficient to qualify as testimony pursuant to section 115-10." In *Learn*, the Second District determined that "[i]f the child is the only witness (other than hearsay reporters) who can accuse the defendant of actions constituting the charged offense, the child *must* testify and accuse if she is to be considered to have testified at the proceeding under section 115-10(b)(2)(A)." (Emphasis in original.) *Id.* at 900.

¶ 42    In addition, defendant cites our supreme court's decision in *People v. Kitch*, 239 Ill. 2d 452 (2011). In *Kitch*, our supreme court considered the adequacy of the testimony given by two child witnesses and framed the issue as follows: "whether, as defendant argues, the State improperly failed to ask the victims about each incident in enough detail

18

to establish the elements of each count." *Id.* at 462. Defendant notes that our supreme court in *Kitch* distinguished, but did not overrule, *Learn*. *Id*. at 464-65.

¶ 43 We note that, while the present appeal was pending, this court issued a decision expressing disagreement with the Second District's decision in *Learn*. See *People v. Graves*, 2021 IL App (5th) 200104, ¶ 41 ("To the extent that our decision here can be read as being inconsistent with the appellate court's ruling in *Learn*, we respectfully disagree with the conclusion reached by the court in that case and do not believe that it reflects the current state of Illinois law on this issue."). In *Graves*, this court noted that the Second District, by requiring a child to "testify and accuse," was the only court to implicitly find that the statute required more than availability for cross-examination to satisfy the confrontation clause. *Id*. (citing *People v. Kennebrew*, 2014 IL App (2d) 121169, ¶ 38). In light of this court's recent decision, we do not find defendant's reliance on *Learn* persuasive.

¶ 44 We also find the circumstances of the present case distinguishable from those presented in *Learn*. Here, unlike *Learn*, N.B. never became unwilling, unable, or incompetent during her trial testimony, and she responded to questions about her out-of-court statements. Although she displayed hesitancy and merely nodded her head in response to some questions at trial, N.B. responded to each question asked on direct examination and cross-examination. N.B. identified a photograph of defendant and recalled that "something bad" had happened when she lived at his house. The State elicited testimony from N.B. that defendant had showed her adult movies on his computer and indicated he would allow N.B. to see his "private part." When asked by the

19

State, N.B. confirmed that she had made statements to the CAC and her parents after "something bad" had happened with defendant at his house. Under these circumstances, we cannot say that N.B.'s testimony failed to satisfy the requirements of section 115-10. Thus, we conclude that the trial court did not commit a clear or obvious error in admitting N.B.'s out-of-court statements under the statute.

¶ 45    We next consider whether the admission of N.B.'s out-of-court statements violated defendant's right to confrontation. The question of whether a defendant's constitutional rights under the confrontation clause were violated by the admission of evidence presents a question of law subject to *de novo* review. *Dabney*, 2017 IL App (3d) 140915, ¶ 17. In addition to the statutory requirements, an out-of-court statement of a minor child may only be admitted at trial if the statement meets the constitutional requirements set forth in *Crawford v. Washington*, 541 U.S. 36 (2004). *Kitch*, 239 Ill. 2d at 469. "The confrontation clause guarantees a criminal defendant the right to confront the witnesses against him or her." *Dabney*, 2017 IL App (3d) 140915, ¶ 18; U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. In *Crawford*, the United States Supreme Court concluded that there is no restriction on the admission of an out-of-court statement under the confrontation clause when the declarant testifies at trial and is present to defend or explain the statement on cross-examination. 541 U.S. at 59 n.9; *Kitch*, 239 Ill. 2d at 467. In other words, when a declarant testifies at trial and is present to defend or explain their statements on cross-examination, "the admission of their hearsay statements under section 115-10 does not violate the confrontation clause." *Kitch*, 239 Ill. 2d at 467.

20

¶ 46    " 'Where the declarant appears for cross-examination, even where the declarant does not testify to the substance of [her] hearsay statement, its admission is a nonevent under the confrontation clause.' " *People v. Smith*, 2019 IL App (3d) 160631, ¶ 31 (quoting *People v. Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 66). As this court noted in *Graves*, "many Illinois cases have held that child victims of sex offenses were available for cross-examination for confrontation clause purposes where they testified at trial and answered the questions asked of them on cross-examination even if they did not testify to all or some of the charged conduct." 2021 IL App (5th) 200104, ¶ 43 (citing *Smith*, 2019 IL App (3d) 160631, ¶ 31, and *Dabney*, 2017 IL App (3d) 140915, ¶ 20). "[T]he key inquiry when determining whether a declarant is available for cross-examination is whether the declarant was present for cross-examination and answered questions asked of her by defense counsel." (Internal quotation marks omitted.) *In re Brandon P.*, 2013 IL App (4th) 111022, ¶ 46.

¶ 47    Here, it is undisputed that N.B. was present for cross-examination and answered the few questions posed to her by defense counsel. Specifically, N.B. provided an affirmative response when asked if defendant had shown her adult movies on his computer. When asked if "that was the only thing" she had seen defendant do, N.B. responded, "No." After N.B. affirmed there was "another time" where "something happened," defense counsel asked N.B. if she could talk about that time and she answered, "No, not right now." Defense counsel, without pressing N.B. for an alternative answer, then stated, "Okay," and asked if defendant had touched N.B. In response, N.B. moved her head up and down indicating an affirmative response. Defense counsel then

21

asked N.B. if defendant had "put his fingers inside" of her, and N.B. moved her head up and down indicating an affirmative response. Under these circumstances, we cannot say that N.B. was unavailable for cross-examination.

¶ 48 Although N.B. did not provide specific testimony about defendant exposing his penis to her, we note that defense counsel did not specifically ask N.B. if defendant had exposed his penis to her. Defense counsel also did not ask N.B. if she told the CAC interviewer that she had seen defendant's penis. In addition, when N.B. indicated that she did not want to discuss the other time "something happened," defense counsel accepted N.B.'s answer and did not ask any follow-up questions concerning the matter. As the State correctly notes, a defendant cannot complain that the witness was unavailable for cross-examination when the defendant makes no attempt to cross-examine a witness regarding her out-of-court statements. See *People v. Lewis*, 223 Ill. 2d 393, 405 (2006) ("An opportunity to cross-examine on the issue is all that is required under section 115-12(b)."). Based on the record before us, we cannot say that the admission of N.B.'s out-of-court statements, accusing defendant of exposing his penis to her, clearly violated the requirements of the confrontation clause.

¶ 49 In light of the foregoing, we conclude that defendant has failed to establish that the admission of N.B.'s out-of-court statements constituted a clear or obvious error. Therefore, we must honor his procedural forfeiture.

¶ 50 Defendant's final argument on appeal is that defense counsel was ineffective for failing "to object to the admission of the CAC interview once it became clear that N.B. was unavailable as a matter of law to testify about her statement." To establish a claim of

ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability the outcome of the proceedings would have been different but for counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a defendant cannot satisfy both prongs of this test, the claim must fail. *Id.* at 697. To establish counsel's performance was deficient, a defendant must overcome the strong presumption that counsel's challenged action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). In general, counsel's decisions regarding what to object to and when to object are considered matters of trial strategy. *Id.* at 344. Here, because we have determined that the admission of defendant's out-of-court statements did not violate the requirements of section 115-10 nor his sixth amendment right to confront witnesses, defendant cannot show that he was prejudiced by counsel's failure to object to the introduction of N.B.'s CAC interview at trial.

¶ 51                                        III. Conclusion

¶ 52     For the foregoing reasons, we affirm judgment of the circuit court of Franklin County.


¶ 53     Affirmed.